1
UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

2
------------------------------------------------------------

3
Thelma Jones; Priyia Lacey;        )   File No. 18-cv-1643
Faisa Abdi; Ali Ali; Rukiya        )          (JRT/HB)

4
Hussein; David Trotter-Ford;       )
Lucia Porras; and Somali           )

5
Community Resettlement             )   St. Paul, Minnesota
Services, Inc.,                    )   April 25, 2019

6
                                   )   9:35 a.m.
                                   )

7
        Plaintiffs,                )
                                   )

8
vs.                                )
                                   )

City of Faribault,                 )
9
                                   )
        Defendant.                 )

10
------------------------------------------------------------

11
BEFORE THE HONORABLE HILDY BOWBEER
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12
**(Motion Hearing)**

13
APPEARANCES
For the Plaintiffs:        American Civil Liberties Union

14
                          Foundation
                          ALEJANDRO ORTIZ, ESQ.

15
                          JOSHUA DAVID RIEGEL, ESQ.
                          125 Broad Street, 18th Floor

16
                          New York, New York  10004

17
                          ACLU of Minnesota
                          TERESA J. NELSON, ESQ.

18
                          P.O. Box 14720
                          Minneapolis, Minnesota  55414

19

For the Defendant:        Iverson Reuvers Condon
20
                          PAUL D. REUVERS, ESQ.
                          ANDREW A. WOLF, ESQ.

21
                          9321 Ensign Avenue South
                          Bloomington, Minnesota  55438

22

Court Reporter:           ERIN D. DROST, RMR-CRR
23
                          Suite 146
                          316 North Robert Street

24
                          St. Paul, Minnesota 55101

25
    Proceedings recorded by stenographic reporter;
transcript produced by computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3
4        THE COURT:  We are in court this morning in the
5    matter of Thelma Jones, et al., versus the City of
6    Faribault.  This is Matter No. 18-cv-1643, and we are here
7    on Docket No. 31, which is Plaintiffs' motion to compel.
8    Let me start by getting some appearances.  First, on behalf
9    of the Plaintiffs.
10       MR. ORTIZ:  Good morning, Your Honor.  Alejandro
11   Ortiz.
12       MS. NELSON:  Good morning, Your Honor.  Teresa
13   Nelson.
14       MR. RIEGEL:  Good morning, Your Honor.  Joshua
15   Riegel.
16       THE COURT:  Okay.  Good morning.
17       And on behalf of the Defendant?
18       MR. REUVERS:  Paul Reuvers and Andrew Wolf,
19   Your Honor.
20       THE COURT:  Good morning to you as well.
21       This, as I said, is Plaintiffs' motion.  I think,
22   obviously, there are kind of two pieces to it, and I think
23   it might make the most sense to take them one at a time, so
24   we can -- and I'm willing to take them in whichever order
25   you'd like to take them, but let's do them one at a time.

1      So hear from Plaintiffs and then hear from defense counsel

2      and get that sorted out, and then move to the next issue.

3      So who will be arguing on behalf of the Plaintiffs?

4              MR. ORTIZ:  I will, Your Honor.

5              THE COURT:  All right.  Please come up to the

6      podium.

7              MR. ORTIZ:  Good morning again, Your Honor.  So

8      given your preference, I'll start with the privilege log

9      issue.

10             THE COURT:  Okay.

11             MR. ORTIZ:  And we can return to the occupancy

12     registers after we've heard from the City.

13             THE COURT:  I'm going to ask you maybe to raise

14     the podium just a little bit and speak up a little bit.

15     You've got a fairly soft voice, and I'm having a little

16     trouble hearing you.  It's right in the very front of the

17     podium -- no, front.

18             MR. ORTIZ:  Up here?

19             THE COURT:  Well, no, facing you.  But -- there

20     you go.  Okay.  That should work.

21             MR. ORTIZ:  How's this?  Is that better?

22             THE COURT:  I think that's better.  Thank you.

23             MR. ORTIZ:  Okay.  Sure.  So regarding the aspect

24     involving the privilege log, you've read the papers so I

25     won't repeat them, but I'll just sort of address the most

1   recent filing by the City.  In the Plaintiffs' view, the

2   Court should reject the supplemental log offered by the City

3   and grant the Plaintiffs' motion for several reasons,

4   beginning with they still -- the City has yet to submit a --

5   an accompanying affidavit of any kind to support its

6   200-plus privilege claims, which is required by Eighth

7   Circuit law as --

8           THE COURT:  Is -- let me understand that a little

9   better.  Certainly I know that it's often the case when

10  specific entries are being challenged, and, for example, in

11  connection with an in camera review or a specific challenge

12  to whether a particular person was in a particular role or,

13  you know, that kind of thing, that -- that a -- affidavits

14  may be required, but I'm certainly not aware of a

15  requirement that a privilege log, when it is being produced

16  to the other party, must be accompanied by an affidavit in

17  order to be valid.  I've done a lot of privilege logs in my

18  days, and I don't remember ever providing an affidavit with

19  them, although I do know that if I was trying to defend

20  particular entries in connection with motion practice, an

21  affidavit at that point might be part of the -- part of what

22  was required.

23          MR. ORTIZ:  Right.  Well, that's where we are now,

24  Your Honor, at this point.  And not only have they failed to

25  provide any written affidavit, despite our invitation, they

1    haven't identified factual assertions in their privilege log

2    that would be, you know, a functional substitute to an

3    affidavit.  And the affidavit serves a purpose.  It could

4    have been from counsel sort of identifying that they've gone

5    through these entries and under penalty of perjury they

6    swear that the entries are valid, as was done in the *CUMIS*

7    case, or they could identify more specifically the factual

8    assertions, if credited within their privilege log, that

9    would meet each of the elements of the attorney-client

10   privilege.  They haven't done either of those things.

11          The -- another example of an affidavit that would

12   be particularly relevant here is there's many entries

13   throughout the privilege log involving police officers --

14   Doug Delesha, Mark Krenik, and a Captain Severson, I

15   believe -- and we don't have any indication from the

16   privilege log or elsewhere that the -- these three police

17   officers were in a position where they needed to know the

18   contents of the supposedly privileged communication that was

19   being disseminated to them, which is one of the five parts

20   of the *Diversified Industries* test.  We know who Chief

21   Bohlen is.  He's the top of the police department, so he

22   doesn't have a superior, but we also need to know that he

23   was directing, according to *Diversified Industries*, these

24   lower-level officers to communicate directly with the City

25   Attorney's office to solicit legal advice.  We don't have

1    that information.

2         So there's entries throughout the log involving

3    nonattorney employees communicating with other nonattorney

4    employees, and no explanation of why what they were

5    communicating or disseminating or distributing maintained

6    that privilege despite that dissemination.  So an affidavit

7    from Chief Bohlen could have helped establish that, or just

8    more facts in the actual privilege log entry identifying the

9    circumstances for these lower-level individuals, other than,

10   like I said, the chief of police.

11        There's -- there's other individuals throughout

12   the log whose roles are not entirely known.  I mean, the

13   City has asked us to peruse the initial disclosures,

14   responses to interrogatories to identify job titles and

15   Plaintiffs have endeavored to do that, but it's still not

16   clear.  I mean, we have individuals -- we have some job

17   titles in those extraneous documents, but we don't know what

18   their roles are and why they were -- they should be privy to

19   supposedly confidential communication.

20        Carole Dillerud is another example.  She's a

21   former deputy city clerk.  She's not the city clerk.  She's

22   a deputy city clerk.  What role is that?  Why is it a

23   position that requires it to hear privileged communication

24   from the City's Attorney's office?  Al Erneste, he's a

25   former building official.  That's all we know.

 1          Again, none of this -- much of this is not in the

 2     actual log but outside of it.  Kim Clausen, community

 3     development coordinator; Dave Mathews, former building

 4     inspector; Janice Bestul, records supervisor.  So there's --

 5     Marty Smith, planning and rental housing technician.  We

 6     don't have any indication of why these people's roles

 7     required that they -- that they needed to know, as I said,

 8     the contents of supposedly privileged communications.  And,

 9     again, that is the fifth part of the *Diversified Industries*

10     test and the one that's most often cited in case law, that

11     the communication was not disseminated beyond those persons

12     who, because of the structure of the organization, needed to

13     know its contents.

14          THE COURT:  I'm going to ask you to slow down just

15     a bit.

16          MR. ORTIZ:  Sure.  Sure.  Sorry.

17          And another prong that I wanted to highlight again

18     is the No. 2 in that test, the *Diversified Industries* test,

19     that the employee making the communication, soliciting --

20     supposedly soliciting advice from the City Attorney's office

21     did so at the direction of his or her supervisor.  Again,

22     going back to the Bohlen example is a good one.

23          So back to the baseline point that there's just

24     insufficient facts, be it through an affidavit or through

25     the actual log entries, describing the entries to sustain

1    their burden on that particular issue, the extent of the

2    privilege within the organization.

3        In addition, there's other -- set of entries

4    involving no attorney whatsoever on the either "from" field

5    or the "to" field or the "other recipients" field.  And

6    there's no explanation about who the attorney -- what the

7    underlying privileged communication may be that's being

8    disseminated between those nonattorney employees, but this

9    sort of collapses under the *Diversified Industries* test, and

10   why those individuals needed to know contents of the

11   supposedly privileged communication.

12       So as I see it, there's two sort of large buckets

13   of entries that require special scrutiny; those involving no

14   attorney on either the "to/from" fields or "other

15   recipients" field, and those involving an individual whose

16   role we don't know communicating directly with the City

17   Attorney's office.  We need to know whether they were doing

18   so at the direction of their supervisor and whether they

19   needed to know what was being distributed back to them.

20       And I'd also highlight the -- the ongoing

21   prejudice that the Plaintiffs are suffering here.  I mean,

22   we had a deposition yesterday where one of the individuals

23   listed on the log, Janna Viscomi, there's a document -- an

24   e-mail that was sent to her and we could have used it in the

25   deposition potentially.  We know it's responsive to

 1    Plaintiffs' discovery request, otherwise it wouldn't be on

 2    the log, but we don't know if it was -- it's being

 3    rightfully withheld.  And next week we have a deposition

 4    scheduled on Monday with Peter Waldock.  He has 14 to 15

 5    documents on the privilege log that he either sent or

 6    received.  Again, we don't know whether those documents are

 7    being rightfully withheld.  The deposition --

 8               THE COURT:  What is Mr. Waldock's role again?

 9               MR. ORTIZ:  I believe he's a -- I mean, I don't

10    have his job title.  It's not a -- I don't have it in front

11    of me, Your Honor, but he -- it wasn't listed on the

12    privilege log, his actual role.

13               THE COURT:  Uh-huh.

14               MR. ORTIZ:  But it's not obviously a department

15    head.  I mean, so the City -- we know who the heads of

16    certain departments are, like the police department; the

17    community development department is Deanna Kuennen.  We know

18    the city council members.  We know the mayor, but then

19    there's a host of these sort of more nebulous sounding

20    positions in the presumably lower ranks of the City that we

21    don't know exactly what their -- what their roles are, and

22    the job title doesn't give a lot of sort of clarity on that.

23               So I would note for the record -- and we have, you

24    know, eight other depositions scheduled this month -- or

25    total, this month and next month, with more being scheduled,

1    again, for many of the individuals listed on this log.  As

2    Your Honor knows, June 15th is the deadline by which we're

3    to complete all nonexpert depositions; and at this point

4    Plaintiffs are working towards exhausting all 15 of their

5    depositions allowable under the Court's order.

6         So that sort of speaks to the sense of urgency on

7    why as soon as we got the log from them, the first one, our

8    March 15th, within a few business days, we reached out.  We

9    pointed out specific deficiencies; no job titles, no roles,

10   and they balked altogether at that point, as you see from

11   one of the exhibits in the motion, from doing anything about

12   it.

13        So then we tried a second time, wrote a second

14   letter after the status conference with Your Honor on

15   March 27th saying, look, like, here's, again, the problems,

16   and we repeated ourselves and elaborated.  And this time,

17   without any explanation, they wrote us back saying, Okay,

18   we're revising the log, but, again, they didn't identify to

19   what extent, what information they would agree to provide

20   and by when, right.

21        So we were left in a position where Your Honor had

22   set a deadline of April 11th to file a motion to compel on

23   that issue, and so we had to draft it.  And, you know, we

24   were waiting.  We asked them to submit it, you know, as soon

25   as promptly after we conferred with them.  And, you know, as

1     we predicted, they gave it to us after we filed the motion

2     on April 10th, and then despite the disadvantage, sort of

3     practically speaking, we then gave them a very fulsome

4     response to the supplemental log knowing that they would

5     have then an opportunity, as they did, to address those

6     arguments in their response to the motion.  We did that with

7     the hope that Your Honor would consider those arguments and

8     have the benefit, in our view, of a supplemental log.  But

9     in our view, the supplemental log is just a minor

10    improvement on the first log.  And so in Plaintiffs' view,

11    we would ask the Court to undertake a similar analysis that

12    was done by your colleagues, Magistrate Judge Brisbois -- I

13    may be mispronouncing that --

14              THE COURT:  No.  You've got it right.

15              MR. ORTIZ:  -- in *National Credit Union*

16    *Administrative Board vs. CUMIS*, which is cited in our

17    papers, as well as a second case, *Ewald v. Royal Norwegian*

18    *Embassy*.  And we have copies for the Court on those, which

19    we gave notice to the other side.  And in each of those

20    cases -- that was Magistrate Judge Rau -- so in that case,

21    Magistrate Judge Rau found waiver of two disputed e-mails,

22    and -- on the grounds that we're seeking here, which is --

23    in both those cases, but -- and Rau -- you hadn't considered

24    that case before -- in *Ewald*, Judge Rau took a hard look at

25    these privilege entries and decided that there was

1    insufficient information about the roles of the individuals

2    on those e-mails that justify sustaining the privilege

3    claim.  And so for Your Honor, I have a copy of the case and

4    the privilege log that the judge considered in that case, as

5    well as the privilege log that the judge considered -- Judge

6    Brisbois considered in *CUMIS*, and I'd invite Your Honor to

7    take a look at the privilege logs in those cases and the

8    arguments and analysis done by your colleagues in those two

9    cases, and also to see how specific the factual entries were

10   in those privilege logs.  Because not only in *Ewald*, it

11   wasn't just the privilege log that they had -- the judge had

12   before it, but an affidavit, multiple affidavits from an

13   attorney on that case for the -- whose claims they were --

14   the attorney making the claims.  And in that affidavit,

15   which we also provide, the judge -- the attorney identified

16   the roles and made some effort to explain the positions that

17   were -- of the individuals on the e-mails.  But even then,

18   despite that, the judge thought it was insufficient, it

19   wasn't sufficiently detailed to explain why those

20   individuals needed to know the contents of the e-mail -- the

21   disputed two e-mails.

22           So with that, Your Honor, unless you have further

23   questions, I'd offer to the Court two copies of these

24   additional documents.  Again, one is the privilege log from

25   the *CUMIS* case.  Another is the *Ewald* case and the privilege

1    log and an affidavit from that case.

2              THE COURT:  Have you provided these to defense

3    counsel?

4              MR. ORTIZ:  Yes.  We e-mailed them yesterday

5    morning, and we have hard copies for them as well.

6              THE COURT:  All right.  You can hand them up to

7    Mr. Bender.

8              MR. ORTIZ:  So unless Your Honor has further

9    questions, I'll reserve further argument on the other issue

10   and --

11             THE COURT:  All right.  Yeah, let me hear from

12   defense counsel first, and I'll also -- well, let me hear

13   from him first, but I'll also at some point want to take a

14   closer look at this since this is information that had not

15   been in the initial brief.  Okay.  Thank you.

16             Okay.  Go ahead.

17             MR. REUVERS:  Good morning, Your Honor.  Paul

18   Reuvers on behalf of the City.

19             Let me address this notion.  We -- we've worked

20   hard to provide them with the information they requested.

21   We had a meet and confer on the 5th, and this notion of we

22   waited until the end, we worked hard -- it's not two or

23   three e-mails here.  We're talking over 200 entries for us.

24   So the notion that we're trying, we did, to get to them

25   before.  And, actually, they filed their motion early.  I

1      mean they had until the 11th.  They filed their motion on

2      the 10th.  We actually got it to them before then, but --

3      and, candidly, I was trying to avoid the motion.  I gave

4      them more detail in a privilege log than I have in my entire

5      career.

6              THE COURT:  Well, I think -- and I don't want

7      to -- I don't want to -- I'm not trying to describe

8      exhaustively what concerns have been raised, but certainly

9      one of the key concerns that I am hearing from counsel is

10     that there is not enough information in the log, or in any

11     other information they've received, to explain the roles of

12     people who have received putatively privileged information

13     or advice.  And that it's one thing if there's a department

14     head or something like that, but if it's someone that at

15     least by virtue of their job title doesn't look like the

16     kind of person that is in the magic circle, as the Eighth

17     Circuit has -- has described it, then the log doesn't

18     give -- provide any basis to understand why that person was

19     appropriately seeking or receiving or being forwarded legal

20     advice, and that that's information only you can provide;

21     and if you don't, then -- then they don't have what they

22     need under the rules.  So can you -- can you go after that

23     particular piece for me?

24              MR. REUVERS:  I want the Court to keep in mind the

25     City of Faribault is roughly 23,000 people.  The folks that

1    were involved here were all intricately involved, excuse me,

2    in the drafting, introduction, discussion, implementation,

3    revision of this ordinance.  Almost all of these folks -- I

4    mean, you've got the city attorneys, Manderschied, Riggs,

5    Alsop; Anderson is the city administrator, obviously a

6    department head; Mathews, Erneste were the build -- the code

7    officials.  They're in charge of enforcing and inspecting

8    the code or the places.  Chief Bohlen is the chief of

9    police, obviously involved in the -- and they know from the

10   pleadings he was the one advocating for the adoption and

11   implementation of the crime free program.  Sergeant Krenik

12   is the individual who is -- they know.  He's the one charged

13   with the evictions and enforcing the code from the police

14   standpoint.  Mr. Waldock is actually a department head.

15   He's the community development director at the time.  It's

16   in the memos.  They know that.  I mean the memos that they

17   already have that Mr. Waldock provided to city council.

18   He's now the planning director.  He's still with the City.

19   He's still a department head.

20         And, you know, so I believe we have -- No. 1, they

21   know that -- who these folks are from our initial

22   disclosures and just the context of this.  And I'll give you

23   an example, Your Honor.  I mean, it's hard for me to say

24   when they say, well, everything is wrong with our log,

25   without -- you know, I mean, I look at, like, our second

1    one, an e-mail attachment from the City Attorney to the City

2    Administrator, you know, subject/title, "marked up rental

3    dwelling licenses," I mean, I don't know what more we can

4    give them, Your Honor.  And there's -- our list is replete

5    with things like that, so I think they do have sufficient

6    information on these to identify, yes, boy, these are marked

7    up or here's a forward -- we're forwarding the housing

8    ordinance with comments.  I mean, when you look at these,

9    I -- I'm not sure what more we could say other than what the

10   comments were or what the markups were on these things.

11           The suggestion that we needed to do a separate

12   affidavit, you know, No. 1, we signed this as a pleading, so

13   we signed this pursuant to the rules.  We did submit a

14   declaration and incorporated the privilege log into

15   Mr. Wolf's declaration, so I don't think there should be

16   this, oh, hey, we didn't do a separate affidavit, because,

17   frankly, there is one in the file, and we did incorporate

18   that by reference.  So I believe the log does lay out the --

19   we give the subject/title, what it is.  And all of these

20   people were involved in this process, Your Honor.  Again,

21   it's a small city, and that's why all of these folks were

22   involved in these meetings, and I can't say anything more

23   than that, Your Honor, on that.

24           THE COURT:  I understand that the -- that counsel

25   for the Plaintiffs provided you with the *Ewald* case and --

1     let me find -- I'm just looking at the things they handed

2     up.  Actually, all of this -- all of this seems to be about

3     *Ewald*.  Is there another one?  Everything I'm seeing here

4     involves *Ewald*.  Did you say there was another case you were

5     handing up?

6              MR. ORTIZ:  Yeah, the -- the very first document,

7     which says Exhibit A on it.

8              THE COURT:  Right.

9              MR. ORTIZ:  That's actually the privilege log for

10    the *CUMIS* case.

11             THE COURT:  Oh, okay.  So you didn't hand up a

12    copy of the case but you handed up a copy of the privilege

13    log.

14             MR. ORTIZ:  *CUMIS* was cited in our --

15             THE COURT:  Right.  I understand that.

16             MR. ORTIZ:  Okay.

17             THE COURT:  I'm just making sure I know what goes

18    with what.  Okay.  So, in any event, could you -- have

19    you -- could you address why the steps taken by the

20    magistrate judges in those cases aren't appropriate here?

21    In other words, what was different about what the producing

22    parties did or didn't do in those cases that distinguishes

23    them from what we've got going on here?

24             MR. REUVERS:  Well, Your Honor, No. 1, I don't

25    believe those were municipalities.  I mean, I think there's

1    a distinguishing factor there.  We have a small --

2            THE COURT:  In how exactly?  I mean, tell me

3    what -- I know the difference between an individual and a

4    municipality, but for purposes of this motion and this

5    argument, tell me why that makes a difference.

6            MR. REUVERS:  Well, I look at, Your Honor, is the

7    small organization that -- we are a tiny organization, and,

8    again, these are all the people that were involved in the

9    entire process and have continued to be involved.  I -- I

10   just think it's a different situation here.  We don't have

11   this massive corporation where people are on the sidelines.

12   These are the people that were -- have been and have

13   continued to be involved in the process.  So I just think

14   that's -- that's the distinguishing factor, Your Honor.

15           THE COURT:  Okay.  So -- All right.

16           MR. ORTIZ:  And I just think that we have

17   provided -- when I look at, you know, marked up rental

18   ordinance or rental ordinance with comments, and when I go

19   through this, Your Honor, I do believe that there is -- you

20   know, legal advice regarding response to request for data,

21   you know --

22           THE COURT:  No, and I'm inclined to agree for

23   most.  Now there's some of the subject matter entries -- or

24   entries in the subject matter column where it just says,

25   "RE: Call" where there isn't anything.  And I assume that's

1    because you simply captured the subject line in that column;

2    and if there wasn't anything more descriptive in the subject

3    line, then nothing got captured?

4              MR. REUVERS:  There wasn't or there's a couple

5    instances where -- I mean, a very few where it could -- it

6    will tell you what it was about.  I mean, we think it would

7    disclose the actual nature of -- it would disclose the

8    advice or give too much information.  That's -- but there's

9    very few.

10             And the problem we have, Your Honor, is if they

11   would say, Let's talk about this one, then it would give us

12   an opportunity to say, Okay, let's focus on these two

13   e-mails.  Like in these cases, let's focus on these.  Okay,

14   then if you need more, we think you have, but then we can

15   focus on that.  They're just throwing it all up here right

16   now, and we're supposed to kind of guess of which ones --

17             THE COURT:  Uh-huh.

18             MR. REUVERS:  -- aren't good enough.  That's --

19   We're in a tough situation on that, Your Honor.  We've

20   endeavored to give them everything they needed.  If they

21   want to talk about No. 2, No. 4, No. 5, we're happy to

22   provide additional information if they think they need that,

23   but, again, we think we've given sufficient information to

24   evaluate that.

25             THE COURT:  Well, have they told you, though -- by

1    way of alternative, have they told you that communications

2    involving certain people are communications that trouble

3    them because it's their understanding that the role of this

4    person or the position of this person was X, so provide some

5    additional understanding of what it was about that person's

6    role that made it necessary for them to seek or receive

7    legal advice?  So instead of on an entry-by-entry basis,

8    have they identified particular people that they believe are

9    kind of outside that magic circle and for which they need a

10   better understanding of why they should -- they're actually

11   in the magic circle?

12          MR. REUVERS:  Uh-huh.  Well, I will tell you,

13   Your Honor, you know, to the extent that everyone that we've

14   listed is in the magic circle in the sense I can tick off --

15   you know, if they say, Why is Erneste and Mathews in there?

16   Well, they're the building officials in charge of code

17   enforcement and involved in when the code was drafted and

18   revised in that process.  That's their role here.  Again,

19   all of these people, if they're not department heads --

20   Deanna Kuennen, Kim Clausen, these are all department

21   heads -- almost everybody is department heads on this list

22   except for Mathews, Erneste, and Krenik, who is the sergeant

23   who is involved in the implementation and -- of the -- the

24   eviction process, you know, the implementation of the

25   ordinance.  So, again, I don't know what more I can give

1    Your Honor than that.

2            But -- and the fact that the clerk is at the

3    meeting, who may be taking notes, doesn't disqual- -- that's

4    the job, you know, if they're there in a meeting that's an

5    attorney-client privilege meeting.  Just like if I'm meeting

6    with the city council and the city clerk is there, who may

7    be taking notes, that doesn't disqualify the privilege, the

8    fact that somebody that that's their job is to take notes

9    and to, you know, make sure that everybody knows what

10   happens at the meeting.  So I don't see how that

11   disqualifies or impacts the privilege at all, Your Honor, so

12   I --

13            THE COURT:  Okay.

14            MR. REUVERS:  And just this notion that let's

15   just, you know, give them -- let's just waive the privilege,

16   we -- the waiver cases, as I read them, have been where

17   people haven't done it or they haven't tried to do anything.

18   We've worked hard.  We've immediately gave them the

19   privilege log.  We have revised it.  It's not a situation

20   where we just didn't do anything or did it at the eleventh

21   hour.  And, again, our role is trying to give them more.  We

22   thought we were sufficient.  We said, fine, let's see if we

23   can avoid this motion and we couldn't; and I think we've

24   complied with the rules, Your Honor.  And the remedy is --

25   and I know the Court doesn't want to do an in camera review

1    of this.  I know you don't want to, but that's -- we're

2    going to be going down this path, I think.  As opposed to

3    just give them all of this, I think that's what's going to

4    ultimately happen, and I don't think the Court wants to go

5    down --

6            THE COURT:  Well, I will do whatever is

7    appropriate.  Would I put in camera review at the top of my

8    list of the fun things about my job?  Probably not.  But I

9    will do an in camera review if that's the appropriate path,

10   so...

11           MR. REUVERS:  Well, and with that, Your Honor, I'm

12   going to stand on our -- the log that we provided and the

13   brief that we've submitted.

14           THE COURT:  All right.

15           MR. REUVERS:  Thank you.

16           THE COURT:  Thank you.

17           All right.  Do you have further response?

18           MR. ORTIZ:  Thank you.  May I respond?

19           THE COURT:  Of course.  That's what I was looking

20   for.

21           MR. ORTIZ:  Sure.  Instead of moving on to the

22   second topic.

23           THE COURT:  Right.

24           MR. ORTIZ:  Just a few quick points, Your Honor.

25   First, I mean, we're hearing today more information on some

1     of these people's roles than we've heard before.  Deputy

2     clerk taking notes.  You know, I didn't know what that role

3     was.  I mean this is the first time we're hearing some

4     details despite the fact that now we're in court and again

5     sort of reference to the fact that we're in the middle of

6     depositions here and it would have been helpful to get more

7     detailed information --

8             THE COURT:  Uh-huh.

9             MR. ORTIZ:  -- before.  This is one of the grounds

10    for waiver; that it's unfair to the Plaintiffs and it's

11    unjustified on their part to not give a more fulsome account

12    of these people's not only job duties -- I mean, he focussed

13    on -- Mr. Reuvers on their job duties just now, but that's

14    not all they need to do.  I mean, the question is you've got

15    to tie the job duties to the document, the communication

16    that's being sent or received, and make some showing that

17    the -- the communication, the subject matter of it falls

18    within the scope of the job duties such that that individual

19    receiving or sending it should have received it.  This is

20    No. 4 in the *Diversified Industries* test, that the subject

21    matter of the communication is within the scope of the

22    employee's duties.  And for those people who aren't

23    department heads, they also have to show, as I mentioned

24    before, that the supervisor asked them to -- to make the

25    request of the City Attorney's office.  This is No. 2 in the

1    *Diversified Industries* test.

2           As to the comment regarding there was one entry

3    log focus involving -- where the description involved marked

4    up revisions, again, we don't know -- I mean, not every

5    communication, as Your Honor knows, that an attorney is on

6    is necessarily privileged, okay.  We need to know what role

7    the attorney had in receiving or sending the document.  In

8    this case, a marked up document, that could be proofreading

9    or editing.  It could be some other capacity other than --

10   like that's marked up with legal advice and that's not

11   clear.

12          THE COURT:  Well, I do think that there's a point

13   at which you've gone as far as is really practical to go

14   with a privilege log.  I mean, the -- I'm not aware of --

15   I'm not aware of cases that require a privilege log to go

16   into that level of -- into that level of detail.  Now, I

17   certainly understand that if specific documents are

18   challenged, that then there may need to be a stronger

19   showing.  Right now what you've got is a -- you know, is an

20   all documents challenge.  There isn't here a -- a specific

21   group of documents being challenged where that would then, I

22   think, make it make sense to do a deeper dive.

23          Now, I do agree with you that there is additional

24   information needed, and I need to -- I don't think that the

25   gap is as broad as you've described, but I don't think

1    they've reached nirvana yet either on this -- on this

2    privilege log, and I've got to think about how best to

3    address that.  So I -- your concerns are not by any means

4    falling on deaf ears, but I don't believe that -- I

5    certainly don't think that what they've done or have failed

6    to do warrants a finding that they have waived the

7    privilege.  I think the waiver cases are a whole order of

8    magnitude different.

9          Where I am -- I do agree with you that the

10   information that I just heard from Mr. Reuvers appears to be

11   quite a bit more than you had at least in the context of

12   this discussion.  Now, whether you could have gone into all

13   the documents they've produced and pieced these roles

14   together, possibly.  I don't know that I want anybody taking

15   the time right now to go figure out who said what to whom

16   when about that.  But I do believe that a cogent sort of key

17   to the people who appear on this privilege log that has what

18   their position was, what their responsibilities were, and if

19   they changed over time within the scope of the log,

20   identifying by date what those shifts were, because they

21   might have been in the magic circle at one point and not at

22   some other point, and describing more precisely what it was

23   about their responsibilities that made it appropriate for

24   them to be seeking or receiving legal advice.

25          Now, I -- I don't believe that -- but I need to

1    think about it a little bit more, but I don't believe it

2    needs to go as far as -- and I don't think it could be --

3    necessarily be done without starting to breach the privilege

4    itself to talk specifically about what was it about the

5    content of that advice that was particularly relevant to the

6    role of this person.  I think that is -- would be very

7    difficult to do without getting into the content of the

8    advice, which is not what they're required to do, but I am

9    going to require that they provide a more robust key to the

10   players here that describes in a way that you don't have to

11   go hunting through the documents that you did get to

12   understand where they fit in and why it was that they --

13   that they were appropriately either seeking or receiving or

14   being relayed legal advice here.  And then I believe that

15   based on that -- and we'll talk about a few other things

16   that I've got some questions about, and I'll bring

17   Mr. Reuvers back up here to ask him those -- but I believe

18   that with that, you may then be in a position to call out --

19   and what I think we may need to do here is identify kind of

20   a representative sampling of documents that you are

21   concerned about that I would need to take a look at and --

22   in such a way that it doesn't breach whatever privilege may

23   appropriately have been asserted, but gives you some -- some

24   comfort, either that the privilege was appropriately

25   asserted, or if it looks like the boundaries were drawn a

1    little too broadly, then -- then we can see whether there's

2    a pattern there and whether that suggests a deeper dive is

3    necessary.  Does that -- that kind of approach to it make

4    some sense?

5              MR. ORTIZ:  It does, Your Honor, but I would

6    remind the Court again of where we are in the calendar.

7              THE COURT:  I know that.  I know that.  Let's --

8    and sometimes -- you know, sometimes these things take a

9    little bit of extra time, although I'm willing to tackle it

10   quickly and to require them to tackle it quickly.  Tell me

11   more about the deposition schedule coming up.  Now,

12   Mr. Waldock is -- now, he is a department head; right?

13             MR. ORTIZ:  Yeah, I wasn't recalling his exact

14   position earlier, but I'll -- you know, he's involved in the

15   case.  He's involved in a lot of documents that we received.

16             THE COURT:  Uh-huh.

17             MR. ORTIZ:  So we intend on deposing him.  I mean,

18   we're scheduled to depose him on Monday, and we have another

19   six depositions of all individuals that I believe are -- at

20   least many of whom are identified on this log, including

21   Chief Bohlen, that's at the end of May.  We have Deanna

22   Kuennen who is in mid-May.  She's also on these logs.  Mark

23   Krenik in mid-May.  He's on these logs in many places.  If I

24   can take a moment to confer with my --

25             THE COURT:  Sure.

1          MR. ORTIZ:  -- to get the other -- see if I can

2     recall the other individuals.

3          MR. REUVERS:  We can help, Your Honor.  Kim

4     Claussen is a department head.

5          THE COURT:  All right.

6          MR. ORTIZ:  So, Your Honor, just -- so the

7     depositions that we've confirmed, yesterday it was Janna

8     Viscomi.  She had one entry, as I mentioned, that's on the

9     log; Waldock, he's got 14 or 15, that's Monday.  Tuesday

10    it's a city councilwoman named -- I think former city

11    councilwoman, Kay Duchene, D-u-c-h-e-n-e; and then we have

12    Kim Claussen in mid-May, Deanna Kuennen in mid-May, Mark

13    Krenik in mid-May, and Chief Bohlen at the end of May, but

14    we have other names and we're still waiting to hear on other

15    dates.  We intend on probably exhausting all 15 depositions

16    that are allotted to us.  So we intend on examining the

17    other probably city council members who helped pass the

18    original version of this ordinance.  And all of those, we

19    intend to do before the deadline, June 15th.  So as you

20    know, we're in late April right now, we are, you know,

21    combing through documents for these depositions.  So to the

22    extent there's -- these individuals are listed on this log

23    -- and Mark Krenik is a good example.  He's listed on many,

24    many entries in this log.  And from the one org chart that

25    I've come across of the police department, he was at the

1    bottom tier, his particular role as a sergeant, and Chief

2    Bohlen was several tiers above him.  So, you know, I know he

3    was involved in the rental licensing ordinance, but that

4    still doesn't connect whether the documents that were --

5    that he was sending or receiving fall within the scope of

6    his particular role on that issue.  One could imagine that's

7    the case, but we just need more information.  I'm not

8    willing to just sort of guess on that.  We need a little

9    more information on that.

10            THE COURT:  So digging into that for a moment with

11   respect to -- is it Officer Krenik?  Okay.  The -- if he was

12   involved in that particular ordinance, what you're concerned

13   about is whether he was also copied on e-mails that went to

14   subject matter that he was not involved in, but they kind of

15   had a copy list and everybody got copied regardless of

16   whether it was pertinent to their role?  I mean, that's --

17   that's essentially the question.

18            MR. ORTIZ:  Right.

19            THE COURT:  Or a question.

20            MR. ORTIZ:  Yeah, exactly.  There's also other

21   entries I believe where he's -- he and another police

22   officer -- Bohlen I believe is not even involved on some, I

23   could be wrong about that -- but that, you know, he's

24   involved in entries where it's not clear whether he had, you

25   know, permission to sort of disseminate information further

1    down the hierarchy.  There's other police officers on the

2    log as well.

3              THE COURT:  So where he is forwarding --

4    apparently forwarding privileged information, but it's not

5    clear that the people to whom he was forwarding were also

6    within the group of those who needed to know?

7              MR. ORTIZ:  That's right, whether that constituted

8    waiver.

9              THE COURT:  Uh-huh.

10             MR. ORTIZ:  So it's not clear what instruction

11   these individuals got on that question, and that's important

12   to determining whether the privilege was waived.  I mean, it

13   needs to be kept confidential.  That's essential.  And

14   that's their showing -- it's their burden.

15             I mean, Mr. Reuvers made a point about, you know,

16   the Plaintiffs, you know, were willing to have a

17   conversation with certain entries.  Well, at the baseline

18   inquiry, it's their burden to establish their claims.

19   Within four business days of when we got their first log, we

20   said, We see problems with all of these.  There's no --

21   there's no job titles, there's no -- it's not clear that the

22   "to" and the "from" field, whether those are -- you know,

23   the "from" field for e-mail attachments, for example, if

24   that indicates when a communication was sent.  It's not even

25   clear what e-mail attachments were attached to what e-mails.

1    I mean, this is information that the -- the "Designation

2    Notes" column was pure boilerplate, just legal conclusion.

3    We raised all this.  Like, at a baseline, we need more

4    factual matter across the board.

5         Now in the supplemental log, we still think that;

6    but now we can also zero in on particularly problematic

7    entries involving lower-level individuals.  And, again --

8    and I can -- you know, Dave Mathews, Marty Smith, Janice

9    Bestul, Doug Delesha, he's a cop; Jason Severson, another

10   police officer; Al Erneste, former building official; Carole

11   Dillerud, the former deputy clerk.  I mean, we heard a

12   little bit about her today for the first time.

13        Again -- and one thing I want to point out as

14   well -- and you mentioned this just now in your remarks --

15   is we need to know these people's jobs and responsibilities

16   and whether they were entitled to receive this information

17   as of the time it was sent, the communication.  As you

18   pointed out, I mean, Tim Murray is the current city

19   administrator, but there was a log entry, I think 56 and 57

20   in the supplemental log, where it's clear, having --

21   resorting to extraneous documents, that I knew that at the

22   time that that was sent to him, he was not the city

23   administrator.  What role was he in?  And what business does

24   the city engineer, which was his previous role, have getting

25   legal advice from the City Attorney on something that's

1       responsive to this case involving a licensing ordinance?

2       Not clear to me.  And it wasn't identified at all in their

3       role -- in the log or elsewhere.

4              So we need -- so as you said, I mean, it's just

5       not clear.  It's not enough to just say, Go look at the

6       disclosures, right, go look at the responses, which we did,

7       and we pieced it together to the extent we could.  That was

8       an onerous process.  In the meantime, we're getting ready

9       for these depositions as well.  So that's another baseline

10      problem that we've pointed out to them.

11             So another point that I would like to make, I

12      mean, the other side has tried to distinguish itself from

13      cities because -- or from corporations, you know, which the

14      *Diversified Industries* five-part test specifically speaks

15      to.  In order for an employee's communication to an attorney

16      within the organization to be privileged, you have to hit

17      all five parts, and that's important.  It's a conjunctive

18      test.  It's not a factor where you just consider it.  All

19      five parts need to be hit.  I mean, we've been hammering

20      home on the main one, which is whether the receiving

21      receiving -- the sending/receiving employee needed to know

22      the information, but you have to look at the other parts as

23      well, whether the subject matter of the document was within

24      the scope of those duties and whether if they have a

25      supervisor, whether the supervisor directed them to make

1    that solicitation.

2         *In Re: Bieter*, a later Eighth Circuit case, which

3    is cited in our papers, makes it clear that that five-part

4    test applies to any entity organization, any entity client.

5    So the same -- and it makes sense.  I mean, any

6    organization, be it a municipal corporation or a

7    corporation -- a business corporation, they only speak

8    through their human agents, right, and so the same test

9    applies and it makes sense that the same test applies to

10   determine whether -- I mean, it's a more complicated

11   analysis obviously for Your Honor and for anyone receiving a

12   privilege log when the parties are a corporation or some

13   legal entity, because you have to determine the specific

14   constituent agents, whether they, as you say, were in the

15   magic circle or not.  So with that, unless Your Honor has

16   any further questions, I'll --

17        THE COURT:  Hold on one second.  Let me just

18   double check, and I will let you know if I have other

19   questions.  One moment.

20        No.  I don't think I have any other questions.

21   Thank you.

22        MR. ORTIZ:  Thank you, Your Honor.

23        THE COURT:  Mr. Reuvers, brief response.

24        MR. REUVERS:  Your Honor, I think you -- we're

25   happy to put together a more -- as I think your -- what was

1    it -- cogent key to lay out to help connect these dots

2    better.  And we're happy to do that just to help with that.

3    And I think we can do that extremely quickly.

4              THE COURT:  How quickly?

5              MR. REUVERS:  I have a funeral this afternoon, and

6    I would prefer Monday morning first thing just because of

7    that, just to give us Friday to do that.

8              THE COURT:  Here -- so -- let me think about how I

9    want to approach this.  I know we've got depositions coming

10   up.  I don't want to -- I don't want to stall those, but on

11   the other hand, you obviously -- as we go down this path,

12   you are at risk that if I conclude ultimately that documents

13   were withheld that shouldn't have been withheld --

14             MR. REUVERS:  Uh-huh.

15             THE COURT:  -- and depending on how obvious it

16   becomes to me that they were withheld when they shouldn't

17   have been withheld, then you're at risk of having to

18   reproduce, at your cost and possibly including at your cost,

19   their cost of coming back and exploring those documents with

20   appropriate witnesses.  But as I said, I don't believe

21   that -- that at this point.  I certainly don't find that

22   there's been a waiver.  Whether ultimately I conclude that

23   you have succeeded in establishing the privilege is

24   different, but I don't believe that what you've done

25   constitutes a waiver.

1      I think, yeah, what I -- if -- let's start with by

2      close of business -- and I'm not going to declare this

3      motion closed -- but by close of business on Monday, you

4      need to provide what I've described as a key to everyone who

5      has -- who is listed as having received communications, and

6      that's going to need to describe not only their title, but

7      any titles they held during the relevant timeframe, and it's

8      going to also need to describe enough about their job

9      responsibilities, and particularly their job

10     responsibilities vis-a-vis the subject matter of these

11     communications.  Now, I'm not going to require an

12     entry-by-entry-by-entry update, but it's got to be enough

13     that taking that information, they can look at the entries

14     involving those individuals and make some -- you know, draw

15     some reasonable inferences about why they got those

16     communications.  So it's got to talk enough about what their

17     role was about the things that were going on on which advice

18     was being sought.

19          I know that there may be a point on some of that

20     where you cannot say more without getting into the content

21     of the advice itself.  If that's the case, then -- then

22     that's perhaps where in camera review has to step in and

23     fill that gap.  But the more information you can provide in

24     this key, the less likely we're going to need to go that

25     route.

1           And as you are doing that, I -- I expect that you

2      will kind of take a fresh look at the decision making that

3      was done with respect to the log; and if there are

4      documents -- you know, thinking about what roles people had

5      and thinking about what's on -- on the log and thinking

6      about the number of people who were copied on any particular

7      thing, if you realize that somebody got something that

8      really wasn't related to their role or that someone who

9      didn't -- who maybe had every right to get it, forwarded it

10     to folks who didn't need it, then -- then you need to

11     dedesignate those documents and get them produced.  Do you

12     understand?

13           MR. REUVERS:  Absolutely, Your Honor.

14           THE COURT:  Okay.  So we're going to start with

15     that.  You'll get that by close of business Monday.  Then

16     based on that, I'm willing to -- I'm willing to look at a --

17     kind of a representative sample of documents that you

18     believe are likely to illustrate your concerns, and so I'd

19     rather not look at more than a couple dozen.  I think there

20     ought to be a couple dozen representative samples, but you

21     can select them once you've got this additional information.

22           And then with respect to those documents, what

23     I -- you know, you identify them to Mr. Reuvers.  I will

24     then -- with respect to those documents, I will want from --

25     actually, what I will do, because I've got a process, but I

1     might forget a piece of it just kind of riffing here from

2     the bench, but I have a process that I use for in camera

3     review that gives you a chance -- and by you, I'm pointing

4     to Plaintiffs' counsel -- gives you a chance to explain your

5     concern to the extent you have enough information to do

6     that, but at least identify why you are concerned about

7     these documents based on the information you have, give you

8     a chance to respond with as much of that response as is not

9     privileged, obviously provided to them, but to do also a

10    confidential in camera response that provides whatever

11    additional information that may be privileged that will help

12    me understand why you put and kept that document on the

13    list.  I'll do an order that describes that process, but,

14    generally speaking, that's how that will work.  But I know

15    you can't -- I know you can't select those documents really

16    with any level of confidence or perspicacity if you don't

17    have more information about why the heck these people are --

18    were on the -- on the list to begin with.  So does that make

19    sense as a starting point?

20                MS. NELSON:  (Nods head.)

21                THE COURT:  You can -- I've got no problem with

22    your continuing with the depositions in the meantime.

23                MR. REUVERS:  (Nods head.)

24                THE COURT:  If you're feeling good about your

25    process, then that should not raise a concern.  But I will

1    tell you that if I find -- and, particularly, if I find a

2    good number of documents -- the occasional mistake, that

3    happens, but if I find a number of documents that suggest to

4    me a pattern of overinclusion, then I will be looking at

5    requests for fees and redepositions and that sort of thing,

6    and that's, of course, never good for anybody's budget.

7    Right?

8                MR. REUVERS:  I understand, Your Honor.

9                THE COURT:  Okay.  All right.  Anything else on

10   this particular point right now?

11               MR. ORTIZ:  No, Your Honor.

12               MR. REUVERS:  No, Your Honor.

13               THE COURT:  All right.  Good.  Thank you.  Let's

14   move on then to occupancy registers.

15               MR. ORTIZ:  Your Honor, I -- excuse me -- as to

16   the occupancy registers, to begin, the relevance --

17               THE COURT:  I really need to understand more

18   about -- about that.  I mean, I'm willing to look at

19   creative ways to deal with the burden, but I am struggling

20   to understand in kind of Rule 401 terms what -- what -- what

21   fact it is that you -- that you want to prove and need to

22   try to prove that you believe there will be evidence in the

23   occupancy registers that make it more -- more or less

24   likely.  So walk me through that in as tiny, iterative steps

25   as you can.

1          MR. ORTIZ:  Sure.  A couple baseline points before

2     I begin.  I mean, we're not dealing with admitting these

3     registers into evidence just yet, right?  This is discovery,

4     so the Rule 401 standard is a tighter standard from our

5     perspective than the relevancy standard governing discovery.

6          THE COURT:  I realize admissibility -- I realize

7     it doesn't have to be admissible, but it still has to be

8     relevant.

9          MR. ORTIZ:  Sure.

10         THE COURT:  Rule 26 tells us that.  It has to be

11    relevant, and relevance is still defined in terms of a fact

12    that is of consequence and evidence, information that would

13    tend to make that fact more or less probable.

14         MR. ORTIZ:  Sure, Your Honor.  And I'd also --

15    before I go into that, and I'm happy to, I would assert that

16    from our perspective, the relevance objection from the City

17    has been waived.  They did not object on relevance grounds

18    when we requested occupancy registers.  Their response

19    objected on proportionality grounds, not relevance.  It

20    wasn't until later in letter writing that they then drew up

21    the relevance objection.  So under Rule 33(b)(4), we would

22    argue that they've waived the relevance objection and that

23    rule says any ground not stated in a timely objection is

24    waived.

25         Moving on to how occupancy registers

1    are actually --

2              THE COURT:  Proportionality still requires me to

3    look at whether it's worth the candle, so I do still -- I

4    agree that if -- that it appears they've potentially

5    acknowledged some relevance, but I still need to understand

6    how valuable this information is to proving how important a

7    point.

8              MR. ORTIZ:  Sure.  So one of our causes of action

9    is that the occupancy restriction in the challenged

10   ordinance has a disparate impact on the Somali population in

11   the City of Faribault.

12             THE COURT:  Understood.

13             MR. ORTIZ:  And the occupancy registers are a

14   required portion of the ordinance requiring that

15   licensees -- licensees are landlords, property owners who

16   rent out properties -- they're required under the ordinance

17   to keep a register.  And the register, there's a sample form

18   that the City -- I've seen that they recommend licensees

19   use.  But there's required information, you know,

20   statutorily required information that the occupancy register

21   has to include.  That information includes the number of all

22   occupants in the dwelling, the names of the adult occupants

23   in the dwelling, the number of bedrooms in the dwelling,

24   among others.  But those are the three most important

25   pieces.  Why are those important?  They -- they would be

1      evidence of a violation of the occupancy restriction.  The

2      occupancy restriction limits rental dwellings -- the number

3      of occupants per rental dwelling to be two per bedroom plus

4      one.  That's it.  So the occupancy register is a

5      straightforward document that would show whether the

6      occupants in a particular dwelling violate that formula,

7      right, and so it would show that the licensee is in

8      violation of the occupancy restriction, right?

9              THE COURT:  Right.

10             MR. ORTIZ:  And so that's baseline.  That evidence

11     is useful for a couple purposes, not only establishing our

12     claim, which I'll get to in a minute, but also identifying

13     which licensees are in violation of the ordinance in case we

14     want to do outreach to those to talk to them about whether

15     the City has been in touch with them.  We could measure the

16     extent of enforcement of the occupancy restriction by

17     learning the names of licensees who, according to their own

18     documents, are in violation of the ordinance.  All right.

19             So that would go a long way toward showing whether

20     this has an actual disparate impact on the Somali

21     population; the degree of enforcement; how are licensees

22     actually acting.  Are they keeping these registers as

23     required?  If so, are they accurate?  What's happening?  Are

24     they self-enforcing when they see that, well, I'm in

25     violation of the occupancy restriction?  I'm going to go

1     ahead and evict folks because I'm in violation.  I don't

2     want the City coming after me.  Or do they wait for the City

3     to enforce?  So this will help discover that information.

4               THE COURT:  And help me understand a little better

5     how that part of it goes to your claims here?  I mean,

6     because you -- as I read your claims, you haven't alleged an

7     as-applied action here.  I mean, basically you said that the

8     very construct of the ordinance has a disparate impact, but

9     I don't think I've seen an action that it's being applied in

10    a differential or discriminatory way beyond just how it's

11    constructed in the first place.

12              MR. ORTIZ:  Yeah, that's right.  I mean, so this

13    point is a smaller point.  The bigger point -- this point

14    being it's an information-gathering device to understand

15    what licensees we might put on as witnesses.  I mean, so one

16    defense that the City has advanced here is that -- and not

17    necessarily in this portion of the ordinance, but there's

18    also a criminal background check piece where it requires

19    licensees to run criminal background checks on prospective

20    tenants.  They argue, the City does, that it's left up to

21    the discretion of the landlord whether they're going to act

22    on the results of the background check or not.  And so this

23    would give us the names of additional licensees who were

24    sort of impacted by this ordinance and to get -- these are

25    potential witnesses.

1          THE COURT:  Uh-huh.

2          MR. ORTIZ:  Now, setting that aside, the bigger

3    point is that the occupancy register itself, assuming it's

4    authentic, would be evidence of that the -- the occupancy

5    restriction is having an impact.  It would show who -- what

6    families are in violation.  And so if we can establish

7    that -- by the use of surnames that certain -- putting on a

8    witness who can identify, given his or her familiarity with

9    surnames in the Somali community, and we have witnesses who

10   could do that, then they could identify families in

11   violation of the occupancy register.  So if we could show

12   then -- if we have a collection of a group of 100 occupancy

13   registers, say, and we establish that 50 of them show

14   that -- or maybe there's 50 that show that there's a

15   violation of the occupancy restriction.  Of those 50, half

16   are Somali families, and yet Somalis make up only 4 percent,

17   let's say, of the population of Faribault, that would show

18   that the restriction is having an impact on Somali families

19   in particular.  So to that point, you know, the Supreme

20   Court has used surname as a proxy in the *International*

21   *Brotherhood of Teamsters vs. U.S.* case.  That was a Title 7

22   case, right.  And to get at whether individuals of Hispanic

23   origin were being discriminated, they used surnames, right,

24   and it was --

25          THE COURT:  That piece I understand.

1            MR. ORTIZ:  Okay.  All right.

2            THE COURT:  And how you would propose to

3    identify -- of those families, how you would propose to

4    figure out which are more likely based on a surname to be

5    Somali.  So that piece I understood.

6            MR. ORTIZ:  And so the occupancy register, so we

7    intend to show, through more larger demographic data, the

8    potential impact on individuals of Somali descent by the

9    occupancy restriction given their larger families, but this

10   is even better data.  All right.  This is cleaner data

11   because it's the City's own sort of -- it's required by the

12   ordinance, and it would show actual disparate impact as

13   opposed to potential based on the demographic makeup of Rice

14   County versus Minnesota of Somalis versus -- and the sizes

15   of their families as we've been able to sort of piece

16   together through surveys and other data.  This would really

17   provide clear evidence of which -- the size of the Somali

18   families, given how many -- you know, determining by surname

19   which families are Somali, and so it would bolster our

20   disparate impact claim considerably and give us evidence

21   that we don't have right now, which is the disparate impact

22   on the ground in the City of Faribault with this ordinance.

23   So the registers would show that from our perspective.

24           THE COURT:  What about -- one of the things that

25   occurred to me was kind of the potential unintended

1    consequences here.  I mean, you get all these registers and

2    you now have and the City now has a list of every place and

3    every group of tenants that's in violation, and the landlord

4    now knows that the City has a list of every group of

5    tenants.  Are these families going to feel like you've done

6    them any favors to have -- I'm just -- and that's -- maybe

7    that's not something for me to be thinking about one way or

8    the other, but it did strike me, the unintended consequences

9    on these families who, by definition, are at least at the

10   moment still in residence, notwithstanding that the family

11   size may be over the limit, and then they're kind of outed,

12   as are their landlords.  What -- that worries me.

13          MR. ORTIZ:  I understand your concern, Your Honor.

14   I mean, to that question, I mean, we have anecdotal evidence

15   that we've collected of people who are Somali families

16   because a baby is added are evicted.  So from what we're

17   hearing from our clients, landlords are evicting people on

18   the ground when the -- in many circumstances when a baby is

19   added to the family, so it's having an impact already.

20   Whether --

21          THE COURT:  So these -- are these historical

22   records as well?  Are they going to show you who has been

23   evicted or who is there right now?

24          MR. ORTIZ:  Well, we requested the occupancy

25   registers going back to 2015.  So we would show --

1          THE COURT:  Okay.

2          MR. ORTIZ:  -- since it's been in place, and we

3    could then sort of connect those to -- through talking

4    through our organizational plaintiff, which individuals were

5    actually evicted.  We could match up the registers to actual

6    evictions to some extent.  So -- and -- but the greater

7    point is that there may be a risk that the City then acts on

8    the registers, which they claim --

9          THE COURT:  The landlords do.

10          MR. ORTIZ:  -- or landlords and start evicting

11    folks, but it would also bolster our claim, so if we then

12    get a win at trial that there was a disparate impact, and

13    this is, you know, front and center evidence, then we could,

14    you know, get compensation for those individuals who were

15    evicted pursuant to it.  And the City and licensees -- the

16    City would risk additional damages if they acted on that in

17    our view.

18          THE COURT:  Uh-huh.  Okay.

19          MR. ORTIZ:  And so I also want to highlight for

20    Your Honor as to the question of burden -- and this is an

21    important piece that I don't want to overlook -- the City

22    submitted an affidavit by Deanna Kuennen to support its

23    claim of the burden, which we invited repeatedly that they

24    do and they did.  We would challenge the -- sort of the --

25    the depth of that affidavit.  To begin, the City -- the

1    final document that I gave you all in the packet -- this is

2    another document that I also submitted to the City.  I gave

3    you the *Ewald* materials, and I also gave you the occupancy

4    register from *CUMIS*.  But the final document is an e-mail

5    exchange between me, on behalf of Plaintiffs, and counsel

6    for the City on April 10th where we had a discussion about

7    the burden.  I mean, the Plaintiffs have offered a couple

8    times now to help alleviate whatever burden the City claims

9    it is facing.  Right?  And one of the questions the

10   Plaintiffs asked, not the Defendant volunteered, do you have

11   e-mail addresses for some segment of these licensees?  We

12   offered to help with letter drafting.  We can help write

13   that e-mail.  We can help photocopy these registers if we

14   set up a time where there are eight hours on a day where we

15   can be at a particular place receiving these.  And the City

16   got back to us, although they omitted that in their

17   affidavit entirely.  I mean, Deanna Kuennen in her affidavit

18   notes the number of licensees and makes an estimate about

19   how long it would take, one hour per person.  Not clear what

20   the basis for that is when we could maybe have an eight-hour

21   window for everyone to bring them.  It's possible we could

22   just ask licensees to scan it and send it in; and she also

23   said it was a $30-an-hour rate.  It's not clear where that

24   number came.  Why we need someone who's making that much

25   money in particular to be dealing with this issue.

1              But the larger point is they have 270-plus e-mail

2      addresses for the 380 or so licensees, which they admitted

3      to us in this e-mail exchange.  And they offered in that

4      e-mail exchange -- this was also omitted from Deanna

5      Kuennen's affidavit or their papers at all -- they already

6      said they're willing to e-mail these folks.  And we said,

7      that's great, that limits the number of licensees that needs

8      to be reached out to by U.S. mail or phone call which -- to

9      100 or so.

10             And we, the Plaintiffs, are willing to get some

11     representative sample.  We've made that clear, but we -- in

12     consulting with our expert, we need to know more information

13     in terms to make an informed decision on what constitutes a

14     representative sample.  We've asked them for that

15     information.  They've ignored us.  We asked them for the

16     addresses of the rental dwellings so we can capture a

17     geographical representative sample as well and in addition

18     to just sort of numbers of, you know, some proportion of the

19     overall group.  So the fact that they omitted the fact that

20     they already have offered to e-mail folks, that they have

21     these e-mail addresses, and that the Plaintiffs have been

22     willing to offer, I think speaks volumes and maybe answers a

23     lot of your questions about the extent of the burden that

24     they claim to be facing.

25             THE COURT:  Uh-huh.

1          MR. ORTIZ:  I don't think it's this great --

2          THE COURT:  Remind me again what percentage of the

3    total number of licensees for which they have e-mail

4    addresses.

5          MR. ORTIZ:  They have 274 e-mails addresses of the

6    384 licensees --

7          THE COURT:  Okay.

8          MR. ORTIZ:  -- which they say in the e-mail that I

9    submitted, which, again, they omitted entirely in their

10   papers that they filed later with this Court as if that

11   exchange never happened.  And they offered, again, to e-mail

12   those licensees.  That's, you know, roughly two-thirds or

13   so, if not more, of the licensees.  That leaves about 110 or

14   so licensees that need to be reached out to through other

15   means.  I mean, we're talking about a single e-mail with 274

16   recipients.  It could be drafted in a certain way to sort of

17   compel compliance.  And we're willing to help with that.

18   We're willing to help draft the e-mail --

19         THE COURT:  Uh-huh.

20         MR. ORTIZ:  -- and willing to help receive them at

21   their direction.  We had a conversation about this on the

22   phone, and Mr. Reuvers expressed concern, about, well, we

23   don't want the ACLU going around to our licensees directly.

24   Okay.  Because that's one of our avenues as well.  We could

25   subpoena these folks.  Right?  So instead of doing that, how

1    about you do the outreach, right, and we'll assist you.

2    They didn't like that idea either, so we've tried to work

3    with them.  They were less than candid in their papers to

4    you about the extent of the burden.  I'd urge Your Honor to

5    consider that, and -- let me see what else I have.  So

6    unless Your Honor has anything else --

7         THE COURT:  Tell me if -- and I obviously want to

8    pursue a number of these points with defense counsel, but in

9    terms of -- if it came to the point where a representative

10   sample looked like the appropriate way to go, what

11   information did you need or does your expert tell you you

12   would need in order to be able to describe a representative

13   sample?

14        MR. ORTIZ:  The total number of rental dwellings,

15   and the addresses for those rental dwellings in the City so

16   that we can -- so that the expert can determine what

17   percentage of the overall group, in his expert judgment, is

18   sufficient, and that we get a sufficiently geographical, you

19   know, snapshot of the entire city so that we're not focussed

20   on a particular area.  One conversation that we had with the

21   City was -- again, Plaintiffs volunteered this.  This was

22   not -- we suggested it, not the City -- that, well, it's our

23   understanding that certain licensees are responsible for a

24   huge amount of rental dwellings.  It's not just, you know,

25   one property owner with one rental dwelling.  It's not a

1       one-to-one ratio.  Right?  In many cases -- and we don't

2       know the extent of this.  We've asked and we haven't been

3       given information -- that there could be -- of these 384

4       licensees, it's entirely possible that 50 of them, let's say

5       as an example, hold -- you know, are responsible for

6       80 percent of the entire rental dwellings in the city.  We

7       don't have that information, but that certainly speaks to

8       the burden.  Right?  If we could address -- just do outreach

9       to a subset of these licensees, again, we would, but we

10      would need to know the addresses of those particular

11      licensees, and if they're just concentrating on a particular

12      area of the city, that wouldn't be sufficient.  But that's

13      the information that would help sort of address the extent

14      of the burden.  Right?  Those licensees that are big

15      landlords, right, that have a lot of rental dwellings, where

16      are those dwellings?  And does it make sense to do outreach

17      to those in particular?  And maybe they have an office where

18      these registers are ordinarily kept, and it's -- you know,

19      they could have staff where they could just fax that

20      information over with no problem.  You know, it might be

21      more alarming to the smaller landlord to be, you know,

22      receiving a call from the City, but, you know, a bigger

23      business, you know, a property managing company that's

24      responsible for maintaining these, maybe they have them on

25      hand very readily and it's not a big deal.  Those calls

 1  haven't been made.  That information hasn't been provided.

 2          THE COURT:  All right.  I maybe have a couple of

 3  follow-up questions, but let me hear first from defense

 4  counsel, and then I'll drag you back up.  Thank you.

 5          Mr. Reuvers.

 6          MR. REUVERS:  Your Honor, occupancy registers, I

 7  don't think we've waived relevance, Your Honor.  I think we

 8  objected as beyond the scope of Rule 26 is what I believe

 9  that showed.

10          THE COURT:  What exactly did you say?  I mean,

11  what --

12          MR. REUVERS:  Yeah.

13          THE COURT:  -- precisely was your response to that

14  request?

15          MR. REUVERS:  I'm going to defer to my colleague

16  if I may, Your Honor.

17          THE COURT:  That would be just fine.  If you could

18  pull that up for me, I'd like to know precisely what your

19  response was.

20          MR. WOLF:  I don't have the responses to the

21  request.

22          THE COURT:  Mr. Ortiz, do you have their actual

23  response?

24          MR. ORTIZ:  I do.  Give me one moment to pull it

25  up.  So we requested copies of all occupancy registers

1    maintained by licensees under the ordinance since its

2    effective date of January 1st, 2015.

3            THE COURT:  Actually, you know what, I'm just -- I

4    thought it was in your papers, and for some reason I

5    couldn't find it when I was looking.  I'm looking at

6    page 14.

7            MR. ORTIZ:  Yeah, that's it.

8            THE COURT:  Right.  Okay.  Let me look at it

9    again.

10           Yeah, so essentially you didn't make a separate

11   relevance objection.  You did say it was not -- you said it

12   was not proportional.

13           MR. REUVERS:  And I guess, Your Honor, to my

14   point, we view that as inclusive of that, or that's part of

15   the analysis, and I think the Court alluded to that.  I

16   think that's part of the analysis is my point, Your Honor.

17           THE COURT:  It is a part of the analysis.  I -- it

18   doesn't -- I don't think it adequately captures sort of, you

19   know, a stand-alone objection that there is nothing about

20   this that would be relevant.  I think it -- in the absence

21   of that, I think it -- it -- certainly you've preserved the

22   objection that it is not as valuable as the burden -- you

23   know, valuable enough to justify the burden; but then, of

24   course, that gets us right into the question of how much of

25   a burden is it really.  So I -- I will tell you that I

1    walked into this proceeding pretty skeptical about the

2    relevance, but I think Mr. Ortiz has adequately explained

3    that to me, and so the real question for me --

4                    MR. REUVERS:  Uh-huh.

5                    THE COURT:  -- is whether there is a -- a

6    reasonable way to skin the cat that doesn't require what was

7    sort of suggested by the affidavit, that it's kind of a

8    one-by-one-by-one-by-one personalized visit and copying

9    session with each of the licensees.  And it sounds to me,

10   from what I'm hearing from Mr. Ortiz, that there may be some

11   other ways to go about it, and I'm not hearing that you've

12   really engaged on that problem solving.  So tell me -- tell

13   me what you are willing to propose --

14                   MR. REUVERS:  Uh-huh.

15                   THE COURT:  -- that would be a reasonable way to

16   go after this information.

17                   MR. REUVERS:  Sure.  And I -- and, Your Honor, I

18   just want to take a step back with the ordinance itself.  I

19   mean, if the City simply had all this stuff, it would just

20   be a different ball game.

21                   THE COURT:  Understood.

22                   MR. REUVERS:  And it would be -- and the

23   ordinance -- you know, you heard them talk about they wanted

24   the registers back to 2015.  That's not what the ordinance

25   requires.  The ordinance says, the licensee shall keep a

1    current register.  So there's no -- you can't ask for a

2    register that's an old one.  The ordinance only requires a

3    current register, so --

4              THE COURT:  So you're saying that you wouldn't --

5              MR. REUVERS:  We can't get something from 2015

6    because the ordinance only requires a current register.  We

7    can't require -- ask for something that they're not required

8    to give us would be my first point, Your Honor.

9              THE COURT:  Right.

10             MR. REUVERS:  But --

11             THE COURT:  Mr. Ortiz, I'll need to hear a little

12   more from you about that, but good point, okay.

13             MR. REUVERS:  But the current register -- and I

14   sat with Ms. Kuennen and frankly was talking -- we've

15   struggled with this -- our program is called Springbrook.

16   This is a data, and the City's struggled to manage the data.

17   And we can't easily extract the data from -- this has been

18   the problem.  So we frankly don't know precisely how many

19   e-mails for each landowner we have.  I mean, that's the

20   problem.  They're going to have to pull every file.  They

21   just can't extract -- when they try to extract different

22   fields, it keeps giving them errors and duplicates, so we've

23   struggled.  We spent an afternoon trying to clarify the

24   precise number of licenses, so we've tried to kind of put

25   this information together as how many licenses do we

1          actually have.  What can we pull?  We should be able to pull

2          the addresses for all the licenses, and we certainly can

3          provide that information, Your Honor.

4                    You know, we were in this discussion mode, and

5          then we got hit with, you know, give us everything.  I

6          just -- and as Ms. Kuennen said too, No. 1, we don't know

7          folks -- they're supposed to have them.  We don't know if

8          they'll have them.  Some people may -- you know, we're going

9          to have to pull each file, so each of the licenses, each of

10         the 737 to kind of pull the contact information.  So this is

11         the problem we have.  It's not as easy as hitting a button

12         and here's all the information and we just spin out a letter

13         and e-mail.  So we do have to pull every property file to

14         prove --

15                    THE COURT:  Even to get mailing addresses?

16                    MR. REUVERS:  Yes, to make sure we have the right

17         one, because the Springbrook program, at least the people

18         that are utilizing it can't access that information easily.

19         So that's -- that's why I understand the Court would say,

20         wow, that seems like a lot of time, but we talked a long

21         time, What do you think it's going to take?  Well, some

22         people -- yeah, I can call some people.  I bet you they will

23         send me some stuff, but some people are going to be really

24         difficult because they don't like to work with the City,

25         so -- and, you know, the ordinance doesn't require them to

1     send it to us.  The ordinance only requires us the ability

2     to view it and copy it.  So, in other words, saying, Hey,

3     come to City Hall and we'll copy your log doesn't solve the

4     issue.

5              THE COURT:  Uh-huh.

6              MR. REUVERS:  That we -- we'd have to identify the

7     contact information for every property first to get that

8     list, which get the contact person for each license.  So we

9     don't have that yet.  We'd have to do that.  I think the --

10    if they would narrow their request, in other words, if we

11    provide the addresses to all of these -- because I believe

12    we can pull that information.  I believe we have that now,

13    and I think we just got that.  We can provide that

14    information.

15             THE COURT:  And can you, along with that, also --

16    that would also include not only the property addresses but

17    the name of the licensee as well so that that would --

18             MR. REUVERS:  I believe it would be the license

19    holder, and sometimes that's an entity and sometimes there's

20    a management comp- -- what I'm getting at is sometimes

21    there's a management company or contact.  There may be an

22    LLC or an individual that holds it.

23             I guess, Your Honor, what I would suggest is that

24    we try to pull that list and give them that information and

25    then to narrow -- you know, if it's a matter of let's try to

1    get these 10 or 15 -- or whatever, you know, a smaller

2    sample size, we can work with a smaller one.  But when we're

3    looking at this level of exercise -- and we don't know if

4    people actually have them.  Now, they're supposed to, but we

5    have reason to believe that a lot of people probably just

6    put the leases in the folder and think that that's their

7    occupancy -- I mean, they may not do it.  They may not have

8    it.

9           The -- you know, I do want to make a point,

10   Your Honor, there has been -- I think we have one letter in

11   the file.  The City has one letter about occupancy -- an

12   occupancy violation.  So this is not a -- we don't have any

13   active -- I think there's one letter saying, hey, you've got

14   too many people when the code enforcement officer saw, you

15   know, a room overflowing with mattresses.  One instance of

16   that is what I believe the record will show.

17          So, I mean, we are concerned about the time and

18   effort.  We do have limited resources.  We are a small city.

19   We're -- frankly, Faribault is a very poor area, and so we

20   don't have an extra person.  So the money is, hey, that's

21   going to be our code guy.  Our code enforcement person makes

22   $30 an hour.  That would be the gentleman that would be

23   assigned because we don't have a separate person.

24          And we can't send the ACLU to go knocking on

25   people's doors.  I don't think that's -- the City is not --

1    that's not something we're going to do to our people.  If

2    they'll voluntarily comply, that's one thing, but we don't

3    have a good e-mail list either.  That's the problem.  We've

4    been trying to get this.  So we don't have this, hey, we've

5    got 200 e-mails that we know are valid e-mail addresses for

6    these 200, we don't have that.  We have to go to each

7    folder.  We thought we did.

8              THE COURT:  But if you are going to each folder in

9    any event to pull addresses --

10             MR. REUVERS:  We would have to pull it.

11             THE COURT:  -- you could also pull e-mails.

12             MR. REUVERS:  We would pull some, and I'm sure

13   there would be a substantial number.  We just don't know how

14   many.

15             THE COURT:  Okay.  All right.

16             MR. REUVERS:  And so I -- the thought, Your Honor,

17   is that we can certainly give -- you know, we've got 737

18   licenses.  We should be able to pull at least the field with

19   the addresses, and that if they would narrow the scope of

20   the number, and if they said -- I think I heard them say

21   they could do a representative sample, I think that would be

22   the -- the way to resolve this, Your Honor.

23             THE COURT:  Although their idea -- their expert's

24   idea of a representative sample may be very different

25   from --

1           MR. REUVERS:  Well, at least we could see what

2     that means, but at least it would narrow -- I'm trying to

3     find a -- and that's the discussion, Your Honor.  If it's a

4     narrowing of the scope, it's just going -- assembling all of

5     these -- and we do believe we're going to have to go door to

6     door on a lot of these.

7           THE COURT:  Uh-huh.

8           MR. REUVERS:  We don't know how many.  We are

9     guessing, Your Honor.  And the affidavit was put together in

10    good faith, so the suggestion that we've been less than

11    candid with the Court, you know, I take issue with because

12    we did work hard and sat with Marty Smith and Deanne

13    Kuennen, Mr. Wolf and I, and had a real candid discussion of

14    how much work this Springbrook program is going to have.  So

15    we personally met on this.  We didn't submit that affidavit

16    lightly.  And it was -- so there is a substantial burden to

17    the City on this and substantial cost that we think is of

18    no -- of limited value, frankly, Your Honor, but --

19          THE COURT:  Let me just make sure I understand one

20    thing.

21          MR. REUVERS:  Yeah.

22          THE COURT:  Because you've talked about the

23    Springbrook program, which I assume is a data management

24    program.  And you've also talked about needing to pull

25    files.  So in order to generate a complete list of addresses

1    for all properties, that's something that you believe can be

2    generated through this Springbrook program; correct?

3              MR. REUVERS:  I believe so, Your Honor.

4              THE COURT:  Okay.  Have you inquired whether also

5    through this Springbrook program you could, with reasonable

6    accuracy, match those addresses to the name of the license

7    holder?

8              MR. REUVERS:  I think --

9              THE COURT:  Or do you know?  Don't guess.

10             MR. REUVERS:  There's a difference -- I'll put it

11   this way, Your Honor, the contact information will not come

12   up.  So, in other words, we can't -- we can't easily pull

13   the contact information without pulling each file.

14             THE COURT:  But the name of the license holder is

15   in the program?

16             MR. REUVERS:  Again, I looked at my colleague,

17   Your Honor.

18             THE COURT:  Of course.  Do you want to come --

19             MR. WOLF:  Sure.

20             THE COURT:  If you want to come up, I have no

21   problem with you teaming together to make sure we have good

22   information here.

23             MR. REUVERS:  And candidly, Your Honor, Mr. Wolf

24   has been more involved in a lot of the data stuff than I am.

25   So he's probably more -- better at this.

1          THE COURT:  Yes, Mr. Wolf.

2          MR. WOLF:  To clarify, once we received this

3     April 10th e-mail, I immediately contacted --

4          THE COURT:  Why don't you get -- move the

5     microphone.  There you go.

6          MR. WOLF:  I immediately contacted the community

7     development department and asked them to pull a list of

8     exactly what they were asking for.  The issue they ran into

9     is e-mail address, number of dwelling units, those are not

10    fields that the City typically uses for its inspection and

11    code enforcement.  Those fields are available, but they

12    don't pull lists with them.  So this initial list they sent

13    us with the e-mail addresses, we find out afterwards, when

14    we're trying to compile this second list, that it's spitting

15    out duplicates, it's spitting out inactive licenses.  So

16    they ran into a lot of quality control issues with putting

17    together this list.

18          And I'm trying to remember specifically what the

19    question was that --

20          THE COURT:  The question was it sounds like you've

21    got some confidence that you can generate --

22          MR. WOLF:  Oh, yes.

23          THE COURT:  -- a complete list of addresses of

24    rental properties, and my question was can you also

25    generate, with reasonable confidence, a list of license

1    holders for each of those rental properties?

2              MR. WOLF:  And I do believe we would be able to do

3    that.

4              THE COURT:  All right.

5              MR. WOLF:  There may be some issue with pulling

6    the names of the owner as well as the contact person as

7    Mr. Reuvers mentioned.  Some people have a local agent or a

8    property manager who is the direct contact for that

9    property, so if we wanted to pull the owner of the property

10   as well as the contact information, that might -- there

11   might be some issues there of running into duplicates and

12   some issues with that, but I do believe we would at least be

13   able to do one or the other accurately.

14             THE COURT:  All right.  All right.  I understand.

15   Thank you.

16             MR. REUVERS:  Your Honor, just the last point,

17   just I do -- I do think that the Teamster's case, you know,

18   the Spanish surname case is different, you know, in the fact

19   that we're going to identify Somali -- because, you know,

20   the -- you know, we don't take race or origin in there.

21             THE COURT:  I know.

22             MR. REUVERS:  Just that we're going to -- just

23   because, you know, a name of Ali or Hussein, that these

24   are -- we know that these are Somali names, I don't think

25   that's -- I think that's a leap.  I think that's different

1    than a -- I mean, there's -- I just think that case is

2    distinguishable that we don't necessarily know that just

3    because somebody has that name, that they are of Somali

4    descent, so that's --

5              THE COURT:  I understand that, although I do think

6    that piece may go more to admissibility.

7              MR. REUVERS:  Uh-huh.

8              THE COURT:  But not necessarily to whether they

9    ought to have the opportunity to collect the data and have

10   an expert attempt to provide an opinion that passes *Daubert*

11   muster about whether these are or not -- are or are not

12   Somali names.  But I -- no, I -- I understand the point

13   you're making.

14             MR. REUVERS:  Yeah, and just my last point,

15   Your Honor, I mean, their expert -- they have disclosed

16   their experts already, their moving experts, so we're past

17   that.  I mean, certainly they'd have rebuttal experts, but

18   that disclosure deadline has passed for them, and they have

19   disclosed their experts, so...

20             THE COURT:  And for all I know, this expert is

21   among the people they've disclosed, so I -- I haven't gotten

22   that far into that, so, okay.

23             MR. REUVERS:  Thank you, Your Honor.

24             THE COURT:  Thank you.

25             Mr. Ortiz, what I -- a couple of things, but I

1    guess off -- just off the bat, if the ordinance -- if the

2    ordinance only requires the landlord to make available for

3    review a current register -- because we've still got to get

4    back here to what the City has control over.  We know they

5    don't have possession.  We know they don't have custody.

6    The question is what do they have control over.  And the

7    argument about control was premised on what the City can

8    require access to, and I -- and they're not arguing and

9    I'm -- and I'm persuaded that if they can require access,

10   then that is control.  If they can't, then the fact that the

11   landlord kind of has it in the back file cabinet, I don't

12   think that -- that doesn't give the City control over it.

13   So I am concerned if we're now back to current occupancy --

14   occupancy registers that only give us a snapshot of who

15   happens to be in residence now and nothing historical about

16   who may have -- about what the total population of tenants,

17   both evicted and unevicted, may have looked like.

18            MR. ORTIZ:  Sure.  A couple points, Your Honor.

19   First, although the City can't require production of other

20   registers, in the same letter, they could ask and they could

21   make it clear, although the ordinance only requires that you

22   produce a current register, we ask that if you have it, you

23   produce previous registers.  That could be a request.  And

24   you could cabin the language to make that clear, that the

25   landlord or licensee isn't required to produce previous

1    registers.  That's one point.

2          A second point, it's possible, we don't know, that

3    a current register is sufficient.  It's possible that many

4    families stay in the same place for years, right?

5          THE COURT:  Uh-huh.

6          MR. ORTIZ:  In which case it would be the same

7    register potentially that covers a period of tenancy that is

8    back to 2015.  We don't know.  So the point that there's

9    some undetermined amount of previous registers that they

10   can't require, we don't know, A, whether that's true.  I

11   mean, A, they can request it, and, B, the current registers

12   could be perfectly sufficient.  Right?  It assumes that

13   people are moving in and out and the landlord sort of, you

14   know, has a list of, like, registers they have and maybe

15   they discard old ones.  I don't know.  Maybe they do discard

16   old ones, but we don't have that information.  So that's as

17   to that point regarding the current registers.

18         As to the e-mails, I mean, we suggested they

19   e-mail folks.  They told us that they have 274 e-mails.  But

20   now I'm hearing today that that is itself its own problem,

21   do they have current e-mails.  Then they can send out U.S.

22   mail.  We know that under the ordinance, every two years,

23   the City inspects rental dwellings.  All right?  They have a

24   rental dwelling inspector, Marty Smith, on staff who

25   inspects them to ensure that the rental dwelling is in

1    compliance with the -- I think the maintenance provisions of

2    the ordinance, so they have these people's addresses.  They

3    go out, they do outreach to them.

4         We saw during the deposition yesterday, we had a

5    document where Chief Bohlen is sending out 1500 letters more

6    to licensees because before this version of the ordinance

7    where there's a two-year -- every-two-year inspection, there

8    used to be a more -- a registration requirement that the

9    City was sending out mailings to licensees.  They do this

10   regularly, and so if that's a more convenient way to do it

11   than finding current versus old e-mail addresses, then do it

12   that route.  I mean, that's something, my understanding,

13   that they already do to do outreach to licensees for certain

14   provisions of this ordinance, so --

15        THE COURT:  So walk me through how that process

16   would work then.  So they -- let's say they mail a letter

17   seeking this information to every one of the licensees and

18   requesting -- well, here we get back to what they can make

19   happen and what they can't make happen -- requesting that

20   the occupancy registers -- that the licensee copy and send

21   in their occupancy registers, and some of them do that, and

22   a bunch of them don't.  What do you propose then is the

23   next -- is the next step?  I mean, is that like, Okay, well,

24   we took our best shot.  We got what we got.  We'll see

25   whether the expert can do anything with it?  Or are you

1    proposing that then there be another round of letters or

2    personal visits, or what -- walk me through this -- this

3    plan.

4            MR. ORTIZ:  We could have a conversation at that

5    point.

6            THE COURT:  Uh-huh.

7            MR. ORTIZ:  We could assess how many licensees

8    voluntarily produced that information.  We could assess

9    that, assess whether it's sufficient for our expert.  If

10   not, we could talk to the City.  We could consider another

11   round of letters -- round of targeted letters if we had more

12   information on what addresses or what parts of town we have

13   an insufficient number of registers from that we need.

14           THE COURT:  Uh-huh.

15           MR. ORTIZ:  We can make a more informed decision

16   on how to proceed at that point.  We could -- the City

17   could -- the ACLU could subpoena those if we need to.  If

18   the City says, You know what, we've exhausted this, we've

19   already spent so much time, our estimates in Kuennen's

20   affidavit were wrong, we actually spent more time, whatever

21   it is, then we can have a conversation about how we could --

22   I mean, how we could get the information that we need for

23   our case.

24           I mean, the City keeps on raising this specter of

25   the ACLU knocking at doors.  We've never proposed that way.

1    We've proposed helping them in any way necessary.  We have

2    staff here in Minnesota where we could -- you know, the

3    letter could say, you know, please mail or scan.  I mean,

4    there's a copy of the register and submit it.  I mean,

5    iPhones have scanning features as an app these days.  It

6    could be a very straightforward exercise.  Right?

7              THE COURT:  I recognize that.  And let me be

8    clear, I do appreciate the creative thinking that you've

9    brought to trying to figure out how we might be able to

10    reduce the burden and get at the information you need.  So

11    what I -- and the reason I'm kind of pushing on what the

12    plan would be is I don't want to have a situation where --

13    or I'd like to minimize the chances of a situation where we

14    go down a road and it takes a certain amount of time, and

15    then we're looking at, well, that didn't work, and -- and

16    trying to reinvent it all over again.

17              MR. ORTIZ:  Right.

18              THE COURT:  So I want to make sure we're kind of

19    looking down the road.

20              Here is what I think, a couple of things.  One is

21    I am going to require you to produce that list of addresses

22    for all properties, and to identify -- it's still a little

23    unclear to me whether what you've got reasonable access to

24    was the license holder or the owner.  I'll require you to --

25    to -- hmm.

1          Let's start with you -- well, let me ask you,

2      Mr. Ortiz, what would be the most useful if they could get

3      it with some reasonable level of confidence?

4          MR. ORTIZ:  Well, I mean, the licensees are the

5      ones that are required to maintain these registers.

6          THE COURT:  Okay.

7          MR. ORTIZ:  It's possible the owner has them too.

8      I don't know.

9          THE COURT:  But the licensee is the one who's

10     supposed --

11         MR. ORTIZ:  Right.  They're the ones required, and

12     often -- I suspect in often cases the licensee is the owner

13     as opposed to, I don't know what, a property management

14     company, in which case the licensee would be working for the

15     owner.  So I think both would be useful, and I just want to

16     emphasize that it's my understanding that the City -- this

17     isn't a foreign concept to the City.  I would urge them to

18     talk to their client, Chief of Police Bohlen.  They do

19     outreach.  They send letters to licensees as part of the

20     compliance for this ordinance.  This isn't something that --

21         THE COURT:  Well, and I'm actually talking about

22     kind of two parallel tracks here.

23         MR. ORTIZ:  Okay.

24         THE COURT:  Okay.  So one is generating that list,

25     because you've told me that one of the things that your

1   expert would need in order to determine whether whatever

2   comes out of this is a -- is a sample that he or she can

3   work with is a list of -- of property addresses.  And so I'm

4   trying to get that for you and whatever additional

5   information would be of assistance in going after that

6   representative sample if it comes to that.  Okay?

7          Second is the -- is developing the mailing.  And

8   that -- that makes sense to me, but I -- and I guess that

9   gets back, Mr. Reuvers, Mr. Wolf, to whether the City has,

10  when it needed to, and when it, you know, served its

11  interest, been able to generate a snail mail mailing list of

12  licensees for these -- for rental properties within its

13  jurisdiction.  Because I think what makes the most sense

14  here is -- given the situation we're in with respect to

15  time, is to start with that mail outreach, but also generate

16  a list of addresses for these properties so that your expert

17  has some information that would allow him or her to

18  determine either whether what comes back in response to the

19  mail outreach is good enough, or if it's not good enough,

20  what would it take to generate a representative sample.  And

21  then we need -- then you need to -- if the mail outreach

22  doesn't get you what you need -- and I honestly don't know

23  how to assess the odds of that -- but if that doesn't get

24  you what you need, then you'll need to meet and confer

25  about -- and ultimately potentially come back to me about

1      that Plan B.  What I'm not going to do is require them to go

2      door to door to door to gather these.  So it's either going

3      to have to happen through -- through a mail -- a mail

4      outreach or through a representative or through a

5      door-to-door representative sample follow-up, or some

6      combination of the two.  But I'm not going to send them out

7      to all 700-some-odd properties.

8               MR. ORTIZ:  Right.  We never contemplated that as

9      an option.

10              THE COURT:  And you've been working on how to find

11     an alternative to that.  So -- so you all need to figure

12     out -- and I think you need to work together perhaps -- on

13     what that letter is going to say, but figure out how you're

14     going to get a mailing out that demands the information

15     you're entitled to and requests the information -- to the

16     extent they've got additional information, makes a request

17     for it, but doesn't pretend that you've -- that you've got

18     the right to demand it.  But at the same time, generate this

19     list of addresses so that your expert can start thinking

20     about what would a representative sample look like if we had

21     to go that route.  Okay?

22              MR. ORTIZ:  Yes, Your Honor.  I mean, this is

23     something we asked for before, the addresses and --

24              THE COURT:  It's fine.  We're here now.

25              MR. ORTIZ:  Okay.

1              THE COURT:  Okay?

2              Mr. Reuvers, Mr. Wolf, any question about what I'm

3      telling you to do?

4              MR. WOLF:  I have a question.  On April 10th we

5      were told that the -- in order to determine a representative

6      sample, we needed to include the number of dwelling units

7      for each property as well.  Is that still something that --

8      because when we tried to produce that list, we tried for

9      about a week before, they said this isn't going to happen.

10     This is taking way too much time and we can't do it.  So is

11     that something that we're being asked to now --

12             MR. ORTIZ:  What was it again, the dwelling unit?

13             THE COURT:  The number of dwelling units in each

14     of these rental properties.  They're saying that they're --

15     that the data management tool they have doesn't have --

16     doesn't report on -- they can't run a report that includes

17     that.

18             MR. ORTIZ:  To my understanding, the list of

19     addresses of all rental dwellings would capture the number

20     of units in a particular property, right?

21             THE COURT:  You know, I think -- let me take a

22     guess.  And tell me if I'm incorrect, but would I be correct

23     in understanding that the -- that the data is there on the

24     Springbrook tool, but that the reports -- as you think about

25     how you can crunch that information, the reporting

1    functionality doesn't pull that up.  You'd have to look

2    at a -- at each entry on a file-by-file basis to get that,

3    or are you saying that the number of dwelling units isn't

4    even something that they track on this Springbrook?

5              MR. WOLF:  It's not something they generally

6    track.  So you can pull a list that has the number of

7    dwelling units, but when you look at that list and then

8    compare it to the active licenses, you find that there are

9    additional properties that are no longer licensed, and there

10   are properties that are currently licensed that are absent

11   from that list, so it's not an accurate list of the current

12   status of the rental dwelling units in the city.

13             THE COURT:  Let me have you do this then, generate

14   something that is on that subject that's the best you can do

15   with reasonable efforts, provide it to Mr. Ortiz with all of

16   the disclaimers that need to be provided so that, you know,

17   you can make it as clear as you need to about where you

18   think the deficiencies may be, but take your best shot at

19   generating that information, and then it's up to them to

20   think about whether it is useful or not.  Okay?  All right.

21             MR. ORTIZ:  Thank you, Your Honor.

22             THE COURT:  So with that understood, I'm going to

23   declare that I have ruled on the part of the motion that

24   deals with the occupancy register.  I understand that there

25   may be, down the line, a further dispute, but that would be

1   the subject of a new conversation, perhaps one that could be

2   dealt with through the IDR process rather than through a

3   formal motion process.

4          With respect to the motion on the privilege log,

5   I'm withholding a rule -- a final ruling on that pending

6   generating some of this additional information and the in

7   camera review, and then I'll issue a final ruling on that

8   once we've walked to the end of that process.  All right?

9          MR. ORTIZ:  Thank you, Your Honor.

10          THE COURT:  Anything left open that I may have

11   missed?

12          MR. ORTIZ:  Not from the Plaintiffs, Your Honor.

13          THE COURT:  All right.  Mr. Reuvers?  Mr. Wolf?

14          MR. REUVERS:  No, Your Honor.

15          THE COURT:  All right.  Thank you for your

16   patience.  I appreciate it.

17          THE LAW CLERK:  All rise.

18       (Court adjourned at 11:22 a.m.)

19                          *     *     *

20       I, Erin D. Drost, certify that the foregoing is a

21   correct transcript from the record of proceedings in the

22   above-entitled matter.

23

24             Certified by:  *s/ Erin D. Drost*

25                            Erin D. Drost, RMR-CRR