**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| THELMA JONES, PRIYIA LACEY, FAISA ABDI, ALI ALI, RUKIYA HUSSEIN, DAVID TROTTER-FORD, LUCIA PORRAS, SOMALI COMMUNITY RESETTLEMENT SERVICES, INC., | No. 18-1643 (JRT/HB) |
| Plaintiffs, | **SEALED MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF FARIBAULT, | |
| Defendant. | |

---

Alejandro Ortiz and Jennesa Calvo-Friedman, **AMERICAN CIVIL LIBERTIES UNION FOUNDATION,** 125 Broad Street, Eighteenth Floor, New York, NY 10004; O. Joseph Balthazor, Jr. and Scott M. Flaherty, **TAFT STETTINIUS & HOLLISTER LLP,** 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402; Ian Bratlie and Teresa Nelson, **ACLU OF MINNESOTA,** P.O. Box 14720, Minneapolis, MN 55414, for plaintiffs.

Andrew A. Wolf, Jason J. Kuboushek, Paul D. Reuvers, and Stephanie A. Angolkar, **IVERSON REUVERS CONDON,** 9321 Ensign Avenue South, Bloomington, MN 55438, for defendant.

Plaintiffs, a group of current and former renters, initiated this case against the City of Faribault ("the City"), claiming that the City's Rental Licensing Ordinance (the "Ordinance") violates the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1981, the Fair Housing Act (the "FHA"), and the Equal Protection Clause of the Minnesota Constitution.  Plaintiffs allege that the City was motivated by race-based and

national origin-based animus in passing the Ordinance, and that the Ordinance makes it more difficult for Black and Hispanic residents to obtain rental housing in the City. After extensive discovery, the parties have both filed Motions for Summary Judgment. The City also asserts that Plaintiffs lack standing to assert their claims.

The Court finds that each Plaintiff has sufficiently established standing with respect to all claims presented. As to the intentional discrimination claims under the Fourteenth Amendment, Section 1981, the FHA, and the Minnesota Equal Protection Clause, the Court finds that the record supports a reasonable inference that racial animus was either a motivating factor or the but-for cause in the City's decision to implement the Ordinance, so the Court will deny the City's Motion as to those claims. However, the Court will likewise deny Plaintiffs' Motion, as there also remains a genuine dispute of material fact as to whether the City's policy objectives were legitimate or merely pretext to discriminate against Black and Hispanic residents.

Furthermore, there remains a genuine dispute of material fact as to whether Plaintiffs have shown a discriminatory effect caused by the Ordinance, as the parties offer conflicting statistical evidence and expert testimony, and weighing such evidence is the task of the factfinder. Accordingly, the Court will deny the cross-Motions as to the FHA disparate impact claims based on the Ordinance's criminal screening policy and occupancy restriction, and the Minnesota Equal Protection Clause claim based on classifications between renters with and without criminal records, and with and without

large families.  However, because Plaintiffs have failed to establish that renters and homeowners are similarly situated, the Court will grant the City's Motion as to Plaintiffs' claim pursuant to the Minnesota Equal Protection Clause based on animus against renters.

## BACKGROUND

The Rental Licensing Ordinance and corresponding Crime-Free Housing Program were passed by the Faribault City Council in 2014.  The parties present starkly different narratives about the events and views leading to the Ordinance's passage, as well as its effects after implementation.  However, except where noted, the following facts are undisputed.[1]

## I.    DEMOGRAPHIC AND PUBLIC SAFETY CONTEXT

The City of Faribault, located in Rice County, Minnesota, has experienced significant demographic changes over the past decades.  In 1990, Faribault had 58 Black

---

[1] In their opposition to the City's Motion for Summary Judgment, Plaintiffs assert that the City relies on inadmissible evidence in violation of Federal Rule of Civil Procedure 56(c).  The Court may only consider admissible evidence when ruling on a motion for summary judgment.  *Walker v. Wayne Cty.*, 850 F.2d 433, 434–35 (8th Cir. 1988).  The Plaintiffs identify several pieces of purportedly inadmissible evidence, including lay opinions on legal conclusions, prohibited by Federal Rule of Evidence 701; irrelevant or improper character evidence, prohibited by Rules 404 and 608; and hearsay not within an exception, prohibited by Rule 802.  The City does not appear to dispute or respond to Plaintiffs' objections.  As such, the Court will not consider the evidence with which Plaintiffs take issue, but Plaintiffs' few objections do not affect the Court's analysis or conclusion on these Motions based on the significant body of undisputed, non-objected-to evidence.

and 253 Latino residents, in 2000 there were 538 Black residents and 1,952 Latino residents, and by 2010 the minority population had grown to 1,743 Black residents and 3,026 Latino residents.  (1st Decl. of Alejandro Ortiz ("1st Ortiz Decl.") ¶ 6, Ex. E ("Parnell Report") at 7, Sept. 3, 2020, Docket No. 216-5.)  The majority of Black residents identify as Somali, (Parnell Report at 7), and the City perceived that the Somali population grew especially quickly starting in 2009.  (1st Ortiz Decl. ¶ 3, Ex. B ("Viscomi Dep.") at 292:7–19, Sept. 3, 2020, Docket No. 216-2.)

In Faribault, between 2012 and 2017, an average of 91.2% of Black households rented, compared to 30.6% of white households.  (Parnell Report at 8–9.)  Many Somali residents live in lower-rent apartments in the downtown area of Faribault.  (*See* 1st Ortiz Decl. ¶ 8, Ex. G ("2011 Downtown Market Analysis") at 24, 26–27, Sept. 3, 2020, Docket No. 216-7.)  According to interviews conducted by the Rice County Housing & Redevelopment Authority in 2018, numerous Somali families reported households of ten to twelve members.  (Parnell Report at 9.)  By one count, as of May 2019, approximately 87.5% of rental units in Faribault with six or more residents included at least one Somali member of the household.  (1st Ortiz Decl. ¶ 12, Ex. K at 3–4, Sept. 3, 2020, Docket No. 216-11.)  Faribault has a dearth of rental housing for large families, (1st Ortiz Decl. ¶ 15, Ex. M at 121, Sept. 3, 2020, Docket No. 216-13; Decl. of Paul Reuvers ("Reuvers Decl.") ¶ 19, Ex. 17 ("Bohlen Dep.") at 53:3–15, Sept. 2, 2020, Docket No. 167-9), and City officials, including current Mayor Voracek, were aware of a housing shortage for large Somali

families, (*See* 1st Ortiz Decl. ¶ 2, Ex. A ("Voracek Dep.") at 56:4-17, Sept. 3, 2020, Docket No. 216-1.)   Yet, in 2014, when Faribault introduced its Community Vision 2040, it included the priority of "A Vibrant Downtown," which included "establish[ing] market rate and high-end residential [units] in the downtown."  (1st Ortiz Decl. ¶ 11, Ex. J at 23, Sept. 3, 2020, Docket No. 216-10.)

As Faribault's demographics changed, and Somali residents moved into apartments downtown and spent time conversing on sidewalks near their homes, (*see* 1st Ortiz Decl. ¶ 9, Ex. H ("1st Jasinki Dep.") at 46:11-25, Sept. 3, 2020, Docket No. 216-8; Viscomi Dep. at 268:4-23), some residents expressed concerns about a perceived rise in crime in the downtown area.   (*See, e.g.*, 2011 Downtown Market Analysis at 7.) Additionally, a number of Faribault residents were particularly concerned about "loitering" downtown by minority residents, which they perceived as threatening and made them uncomfortable, and about which they complained to City officials.  (*Id.* at 29.) One resident even wrote an editorial in the Faribault Daily News titled "Intimidated by Faribault Somalis" in which she described feeling intimidated by three young Somali men walking down the sidewalk, and expressing that "[i]t is very intimidating, to me, to observe these people loitering everywhere" and that she "live[s] in fear of them."  (1st Ortiz Decl. ¶ 28, Ex. Z at 2–3, Sept. 3, 2020, Docket No. 217-5.)

Indeed, former Mayor Jasinski testified that the "number one complaint" he heard was about the Somali population.  (1st Jasinki Dep. at 51:17–22.)  Other City officials

likewise noted loitering issues, including City Councilmember Viscomi, who testified that she believed loitering was harming businesses downtown, (Viscomi Dep. at 185:17–186:25), and City Planning Coordinator Waldock, who testified that business owners complained that Somalis gathered near stores, which frightened customers who were not accustomed to seeing Black people, (Reuvers Decl. ¶ 41, Ex. 39 ("Waldock Dep.") at 124:22-125:12, Sept. 2, 2020, Docket No. 167-31.)  The executive director of Somali Community Resettlement Services, Inc. ("SCRS"), Abdullah Sharif Hared, testified that City officials made racist remarks about Somalis and suggested they move elsewhere. (Reuvers Decl. ¶ 18, Ex. 16 ("Hared Dep.") at 11:21–21:24, Sept. 2, 2020, Docket No. 167-8.)  Residents also expressed concerns related to the Somali community when the local mosque applied for a parking lot in 2015, including that the mosque "would be a breeding ground for terrorists."  (Reuvers Decl. ¶ 36, Ex. 34 ("Rowan Dep.") at 34:19–36:20, Sept. 3, 2020, Docket No. 167-26.)

However, between 2000 and 2014, the overall number of property crimes in Faribault actually fell, even as the population grew.  (Answer ¶ 34, Docket No. 119, Jan 2, 2020.)  Additionally, burglaries dropped consistently between 2010 and 2014.  (1st Ortiz Decl. ¶ 21, Ex. S at 3, Sept. 3, 2020, Docket No. 216-19. )  Around the same time, the Faribault Police Department ("FPD") indicated that there was "little crime in the downtown, and certainly no more than the community at large."  (2011 Downtown Market Analysis at 26.)  On the other hand, statistics also show that Faribault had one of

the top five crime rates among Minnesota cities with 15,000 to 30,000 people in 2014. (Reuvers Decl. ¶ 70, Ex. 68 ("Oct. 2019 Staff Memo") at 34, Sept. 2, 2020, Docket No. 167-41.)

In the fall of 2013, there were discussions within the FPD about implementing a revised loitering ordinance to address, among other things, "cultural clashes" in the downtown area. (1st Ortiz Decl. ¶ 23, Ex. U ("2013 Bohlen Memo") at 3, Sept. 3, 2020, Docket No. 217.) Former Mayor Jasinski also testified that City Council considered a loitering ordinance to address, in part, the groups of Somali men congregating downtown. (1st Jasinski Dep. at 68:4-68:19.) But Chief Bohlen reported a loitering ordinance might be "problematic and unenforceable" after meeting with the City Attorney, and the City did not move forward with a loitering or nuisance ordinance. (2013 Bohlen Memo at 4.)

## II.    CITY INTEREST IN RENTAL LICENSING AND CRIME-FREE HOUSING PROGRAM

The City first became interested in implementing a new Crime Free Rental Multi-Housing ("CFMH") Program around 2007 or 2008, but did not move forward because of a purported lack of FPD resources and budget constraints. (Oct. 2019 Staff Memo at 28.) A consultant recommended a crime-free housing program in 2008 and 2012, (1st Ortiz Decl. ¶ 31, Ex. AC ("2012 Best Practices Review) at 7, 10, Sept. 3, 2020, Docket No. 222), and again in 2013, (Reuvers Decl. ¶ 94, Ex. 92 ("2013 Strategic Plan") at 2, 5, Sept. 2, 2020, Docket No. 168.) Although the City did not implement the crime-free housing program

based on the previous recommendations, such a program had ongoing support among City administrators.  (*See* 2012 Best Practices Review at 7.)

In 2012, Andy Bohlen became Faribault's Police Chief, (*see* Bohlen Dep. at 17:7–9), and he renewed interest in the CFMH Program based on his prior experience with similar programs, (*id*. at 83:24–87:19.)  Chief Bohlen testified that his interest in the program was particularly tied to his concerns about three rental properties, which had 103 police calls within one year.  (*Id.* at 86:1–10.)  One of the "problem properties" was the rental property where Plaintiffs Jones and Lacey lived.  (*Id.* at 86:1–22; *see also* (1st Ortiz Decl. ¶ 78, Ex. BY ("Jones Dep.") at 21:23–22:8, 33:25–34:2, Sept. 3, 2020, Docket No. 222-1.)

While Bohlen was pursuing the CFMH program, the City was reconsidering its then-existing rental registration program because of property maintenance issues.  (Decl. Alan Ernste ¶ 7–8, Sept. 2, 2020, Docket No. 160.)  Some rental housing had code compliance and enforcement issues, as well as structural concerns, particularly in downtown properties.  (*See* Reuvers Decl. ¶¶ 96, Ex. 94, Sept. 2, 2020, Docket No. 169-2; *id.* ¶ 97, Ex. 95, Sept. 2, 2020, Docket No. 168-3.)  City staff suggested shifting from a rental registration to a rental licensing system as early as 2003.  (*See* Waldock Dep. at 133:9–20.)  In 2013, with the help of an outside consultant, the City created a Strategic Plan, which included implementing the CFMH and improving housing options.  (2013 Strategic Plan at 5–6.)

-8-

In 2014, the City Council passed the Rental Licensing Ordinance, including the CFMH and an occupancy restriction, by a unanimous vote. (Reuvers Decl. ¶ 101, Ex. 99 at , Sept. 2, 2020, Docket No. 169.) In conjunction with the vote, then-Mayor Jasinski mentioned concerns with "absentee owners," ensuring properties were maintained, and eliminating multiple police calls to rental properties in order to protect neighbors as motivation for the Ordinance. (Reuvers Decl. ¶ 31, Ex. 29 ("2nd Jasinski Dep.") at 21:2–24:1, Sept. 2, 2020, Docket No. 167-21.) Councilmember Voracek said he voted to pass the Ordinance to enforce "living standards, cleanliness, fire safety, and life safety." (Reuvers Decl. ¶ 40, Ex. 38 ("2nd Voracek Dep.") at 5:11–12, Sept. 2, 2020, Docket No. 167-30.) Councilmember Rowan said the purpose of the CFMH Program was "to ensure that landlords are aware of who they're renting to." (Rowan Dep. at 121:25–126:2.) Rowan also said he supported the occupancy restriction because "you don't want to have too many people being crammed into a room" and that "it goes back to landlords doing the right thing." (*Id.* at 239:23–25.) After the 2014 Ordinance was implemented, and leading up to the 2017 revisions, then-City Manager Anderson stated in a 2016 video that the Ordinance was intended to get some of the "undesirable" residents out of rentals. (1st Ortiz Decl. ¶ 40, Ex. AL ("2016 Video Interview") at 13, Sept. 3, 2020, Docket No. 218-6.)

## III.    THE ORDINANCE

Under the Ordinance, landlords must obtain a license from the City in order to operate a rental dwelling, and must comply with the Ordinance to obtain and maintain

their license.  *See* Faribault, Minn., Code ch. 7, art. V, § 7-38 (2019).[2]  The purpose of the Ordinance is "to assure that rental housing in the City of Faribault is decent, safe and sanitary and is operated and maintained so as not to become a nuisance to the neighborhood or to become an influence that fosters blight and deterioration or creates a disincentive for reinvestment in the community" and to ensure "quiet enjoyment of the normal activities of life in surroundings that are safe, secure, and sanitary, free from noise, nuisances and annoyances, free from unreasonable fears about safety of persons and property, and free of drugs and crime."  *Id.* § 7-36(a).

The Ordinance imposes occupancy restrictions for rental properties.  The current 2019 version provides:

(1) Each rental dwelling must comply with the requirements of the City of Faribault Unified Development Ordinance and Property Maintenance Code.

(2) Notwithstanding paragraph (1), any dwelling unit may permit the total number of occupants to equal two (2) times the number of legal bedrooms plus one.  Occupants under the age of two (2) years shall not be included in the calculations set forth in this paragraph.

*Id.* at § 7-40(h).  The 2017 version of the Ordinance, in effect when Plaintiffs initiated this action, contained the complete occupancy restrictions explicitly, rather than incorporating the Property Maintenance Code by reference.

---

[2] The operative 2019 version of the Ordinance is offered as an exhibit, (*see* Reuvers Decl. ¶ 6, Ex. 4, Sept. 2, 2020, Docket No. 167-4), as are the 2014 and 2017 versions, (*id.* ¶ 4, Ex. 2, Sept. 2, 2020, Docket No. 167-2; *id.* ¶ 5, Ex. 3, Sept. 2, 2020, Docket No. 167-3.)

"Disorderly conduct," broadly defined, is prohibited on all licensed rental properties under the Ordinance. *Id.* at § 7-41(a)–(b). If the City, through the FPD, finds that disorderly conduct occurred on a property "by a preponderance of the evidence"— irrespective of whether a conviction resulted or even criminal charges were brought in conjunction with the conduct—the Ordinance provides for a series of responsive actions to be taken by the landlord against tenants, and imposes penalties against the landlord for disorderly conduct at their property. *Id.* at § 7-41(c)–(d). Licensed landlords can appeal these notices within five days. *Id.* at § 7-41(e). The Ordinance includes an exception to the penalties if it is determined that a landlord was unable to obtain compliance from their tenant. *Id.*

The Ordinance also includes the Crime-Free Housing Program. Its stated premise and purpose, both under the 2017 and 2019 versions of the Ordinance, are that:

> [R]epeated police calls to rental dwelling units in the city related to disturbances or criminal activity have taxed law enforcement resources. . . . [P]ersons residing in rental dwelling units who engage in disorderly conduct or cause nuisance conditions create an unacceptable environment for others living in close proximity, thereby threatening the public safety and welfare of the community. In order to preserve and protect the city's neighborhoods and to promote public safety, the city council enacts this section.

*Id.* at § 7-42(a). Landlords must comply with four elements to retain their rental licenses:

> (1) Attend a certified eight-hour crime-free housing course presented by police, fire, public housing and others.
> (2) Use a written lease which includes the crime-free/drug free housing lease addendum.

-11-

    (3) Conduct a criminal background [sic] of all prospective tenants eighteen (18) years and older and, upon request, provide a copy of third-party background check procedures for tenants.

    (4) Actively pursue the eviction of the tenants or termination of the lease with the tenants who violate the terms of the lease and/or the crime free/drug free housing lease addendum.

*Id.* at § 7-42(b).

The 2019 version, implemented after Plaintiffs initiated this action, also includes several noteworthy changes. First, the 2019 Ordinance includes a new clarification in regard to the criminal background check requirement in element (4), cited above, that "nothing in this provision restricts licensees from entering into leases with applicants possessing a criminal history." (Reuvers Decl. ¶ 6, Ex. 4 ("Redlined Ordinance 2019-17") at 14, Sept. 2, 2020, Docket No. 167-4.). Second, in the 2017 version, "intimidation" was included in the definition of "disorderly conduct," but was removed in 2019. (Redlined Ordinance 2019-17 at 8.) Third, the 2019 version moved the occupancy restriction out of the self-contained Ordinance, and instead incorporated the occupancy restrictions from the Uniform Property Maintenance Code. (*Id.* at 7.) The occupancy provision that remains within the Ordinance has been reworded from "may not exceed two (2) times the number of legal bedrooms plus one" to "may permit the total number of occupants to equal two (2) times the number of legal bedrooms plus one" and the Ordinance now adds an exception for children under two years old. (*Id.* at 8.)

IV.    **CRIME-FREE MULTI-HOUSING TRAINING**

To obtain a rental license, landlords must attend an eight-hour training led by FPD Sergeant Mark Krenik.  (Reuvers Decl. ¶ 69, Ex. 67 ("2019 CFMH Training"), Sept. 2, 2020, Docket No. 167-40.)  The training focuses on enforcement of the CFMH, and a significant portion of the training concerns screening potential tenants, including the use of the mandatory criminal background check, and ensuring that landlords do not rent to "bad tenants."  (*See* 2019 CFMH Training at 24–51.)

Although the Ordinance does not include any criteria for how to interpret criminal history, the 2019 training tells licensees they should "have written selection criteria."  (*Id.* at 51.)  Both the 2018 and 2019 versions of the training presentation inform landlords that a "criminal record does not bar you from renting to the applicant."  (*Id.* at 44; 1st Ortiz. Decl. ¶ 60, Ex. BF ("2018 CFMH Training") at 40, Sept. 3, 2020, Docket No. 219-5.)  However, only the updated 2019 version adds, "according to [the Department of Housing and Urban Development ("HUD")] you cannot deny based on an arrest" and tells landlords to "[c]onsider when the conviction occurred, what the conduct was, and what the convicted person has done since then."  (2019 CFMH Training at 44.)  By contrast, the same slide from the 2018 version said in red font, "[y]ou may find that an applicant has a lengthy history of local police calls in a short period of time yet a clean criminal history – is this person a good fit?"  (2018 CFMH Training at 40.)  The 2018 version, alone, also includes extensive instructions about how landlords should obtain information that may

not be included on a standard background check, such as local police calls and arrests, rather than only convictions. (*Id.* at 47–49.)

Both the 2018 and 2019 training presentations emphasize the risks to landlords if criminal or "disorderly conduct" occurs at their properties. For example, a slide titled "Criminals 101" says that criminals "are like weeds" because they "grow roots" and "choke out healthy plants" and when "a criminal has an opportunity to act . . . They take over an entire rental community!" (2019 CFMH Training at 79.)

Although it is unclear whether the training has been conducted using the 2019 materials, the City has sent out a notice of the revised 2019 Ordinance, updated training materials, and a copy of 2016 HUD Guidance on the FHA to all licensed landlords. (Reuvers Decl. ¶ 71, Ex. 69, Sept. 2, 2020, Docket No. 167-42.)

## V.    DISPUTED IMPACT OF THE ORDINANCE

The parties have very different views about the overall impact of the Ordinance. The City reports a reduction in the number of rental dwellings with code violations, from an average of 126 dwellings with one or more violations between 2015 and 2017, to an average of 75 from 2018 to 2019. (Oct. 2019 Staff Memo at 42.) City Manager Anderson reported 31 families losing their homes by 2016. (2016 Video Interview at 12.) The CFMH has led to at least 125 evictions and 360 minor violations. (1st Ortiz Decl. ¶ 43, Ex. AO ("2019 City Budget") at 10, Sept. 3, 2020, Docket No. 218-9.) At least eleven property owners have been placed on probation for violations of the CFMH, (*id.*), and, as of May

2019, one landlord had been jailed for 90 days for an Ordinance violation, (Rowan Dep. at 179:24–180:6.)

According to FBI data, violent crime has risen in Faribault since enactment of the CFMH in 2014. (*See* 1st Ortiz Decl. ¶ 42, Ex. AN at 4, Sept. 3, 2020, Docket No. 218-8.) Other evidence, however, shows reduction in the crime rate in the City overall. (Oct. 2019 Staff Memo at 11–16.) Around mid-2014, Faribault also joined a drug task force, (*see* 2019 City Budget at 10), and Chief Bohlen opined that the combination of the drug task force, together with the CFMH, may have resulted in a reduction in overall crime. (Reuvers Decl. ¶ 21, Ex. 19 at 108:6–24, Sept. 2, 2020, Docket No. 167-11; *see also* 2019 City Budget at 10–11.)

The parties also dispute the Ordinance's impact on Black and Hispanic renters. One of the Plaintiffs' experts, Dr. Parnell, found that due to racial disparities in convictions at the national and state levels, the Ordinance was likely to disproportionately affect Black and Hispanic renters. (Parnell Report at 23–24.) Specifically, Dr. Parnell found that, in Minnesota, compared to white residents, both Black and Hispanic residents are around six times more likely to have been incarcerated at some point. (*Id.* at 12). Based on Dr. Parnell's analysis, a mandatory criminal background check, if it results in a prohibition on renting to families where even one member has a prior conviction, would predictably lead to 10.61% of Black families, 5.99% of Hispanic families, and 2.39% of white families being prevented from renting in Faribault. (*Id.* at 13.) However, the City presented exhibits at

Dr. Parnell's deposition, which he apparently did not have access to while compiling his report, showing that there are renters in Faribault with criminal backgrounds, including felony convictions. (Reuvers Decl. ¶ 42, Ex. 40 ("Parnell Dep.") at 108:21–122:23, Sept. 2, 2020, Docket No. 167-32.) Dr. Parnell maintained that the Ordinance nonetheless increases the opportunities for discrimination. (Parnell Dep. at 110:18–25.)

In his report, Dr. Parnell also concluded that the occupancy restriction will likely disproportionately impact Black renters. (Parnell Report at 23–24.) Parnell relies on statistics showing that, in Faribault, 70% of Black families, 36.5% of Latino families, and 28.3% of white families in Faribault have children under 18, minority families tend to be larger than white families, and tend to have more occupants per room in their home. (*Id.*)

The City's rebuttal expert, Dr. Steward, points out that Plaintiffs' experts do not rely on any actual housing or rental records from Faribault, and the conviction or incarceration rates are from national, state, and county level data. (2nd Decl. Paul Reuvers ¶ 5, Ex. 4 ("Steward Report") at 6–7, Sept. 23, 2020, Docket No. 232-3.) Dr. Steward also finds that the occupancy restriction would not affect the average minority or Somali family, based on occupants per room. (Steward Report at 11–14.) At his deposition, Dr. Parnell explained that the issue is not the size of an average family, but rather whether there are disproportionately more large Somali families than white families renting, meaning there is a disparate impact from the occupancy restrictions. (*See* Parnell Dep. at 158:3–160:14.)

-16-

## VI.    THE PLAINTIFFS

Plaintiff Thelma Jones is a Black woman who rented a house in Faribault for around five years, where she lived with three children and a grandson.  (1st Ortiz Decl. ¶ 78, Ex. BY ("Jones Dep.") at 6:2–5, 12:21–23, 33:25–34:3, Sept. 3, 2020, Docket No. 222-1.)  Jones was threatened with eviction in 2017, and moved out.  (Jones Dep. at 18: 16–25, 37:14–16.)  Jones contends that she was evicted because her landlord was charged with failing to register for a license under the Ordinance, and that the landlord told Jones that the police said Jones would testify against the landlord on these charges if Jones was not removed from the house for violating the CFMH portion of the Ordinance.  (*Id.* at 27:7–28:3.)  Chief Bohlen and the FPD had identified Jones's rental house as a problem property because of a high number of complaints about the property.[3]  (Bohlen Dep. at 80:7–17.)  After moving out of the five-bedroom house, Jones could not find another home large enough for her entire family in Faribault, so they split up, and Jones moved into a two-bedroom apartment.  (*Id.* at 81:7–17.)

Jones' daughter, Plaintiff Priyia Lacey, who is also Black, has been unable to find stable housing in Faribault since the Jones family was evicted in 2017.  (*See* Reuvers Decl.

---

[3] The parties dispute the reasons for these complaints.  Defendant, the City, attributes them to disorderly conduct and potentially violent activity.  (Bohlen Dep. at 86:1–22.)  Some complaints were about garbage overflowing and alleged drug use.  (1st Ortiz Decl. ¶ 79, Ex. BZ, Sept, 3, 2020, Docket No. 219-24.)  Plaintiffs attribute the complaints to harassment by the Jones's neighbors on account of the family's race.  (Jones Dep. at 21:12–22.)  Jones was never charged or convicted of any crime, and the FPD never confirmed any criminal activity on the property.  (*Id.* at 21:3–4.)

¶ 11, Ex. 9 ("Lacey Dep.") at 7:24–11:17, Sept. 3, 2020, Docket No. 171-1; *see also* Jones Dep. at 6:2–5.)  Lacey was pregnant when the Jones family was evicted, (*see* Lacey Dep. at 40:22–23), and looked for her own place rather than continuing to live with her mother, (*see id.* at 11:3–17.)  In 2018, Lacey was found ineligible for an apartment owned by the Faribault Housing and Redevelopment Agency ("Faribault HRA") due to a criminal assault charge, not a conviction.  (*Id.* at 12:8–13:18.)  Lacey currently lives at her grandmother's apartment in Faribault, and has actively sought and continues to seek her own housing in Faribault but has been unsuccessful.  (*Id.* at 7:24–11:17; 28:24–29:10.)

Plaintiff Faisa Abdi is Somali-American.  (Reuvers Decl. ¶ 12, Ex. 10 ("Abdi Dep.") at 5:9–23, Ex. 10, Sept. 2, 2020, Docket No. 173.)  She and her husband live in a three-bedroom apartment with nine young children.  (Abdi Dep. at 6:2–7:5, 11:25–12:2.)  Abdi asserts that her landlord threatened her family with eviction due to the size of her family and the occupancy restriction of the Ordinance, but they have avoided eviction because Abdi told her landlord she was working on obtaining passports to send two of her children to Africa in order to reduce the size of their household to comply with the occupancy restriction of the Ordinance.  (*Id.* at 13:1–15:7.)  Abdi has been unable to find another rental that is large enough for her family, is worried about not being able to find new housing, and does not want to move somewhere else.  (*Id.* at 17:14–24.)

Plaintiff Ali Ali is Somali-American and lives with his wife and seven children in Faribault. (Reuvers Decl. ¶ 13, Ex. 11 ("Ali Dep.") at 5:16–23; 6:3–19, Sept. 2, 2020, Docket

No. 175.)  The Ali family was told they would be evicted from a three-bedroom apartment in 2017 after the birth of their sixth child.  (Ali Dep. at 14:12–13, 21:2–22:2.)  The landlord attributed the eviction to the occupancy restriction of the Ordinance.  (*Id.* at 21:2–22:2.) After their landlord gave them an extension on eviction so the family could secure new housing, Ali and his family moved into a new home where rent is more expensive some months, depending on the amount of their Section 8 housing voucher.  (*Id.* at 26:23–28:18.)

Plaintiff Rukiya Hussein is Somali-American.  (Reuvers Decl. ¶ 14, Ex. 12 ("Hussein Dep.") at 5:24–6:3, Sept. 2, 2020, Docket No. 177.)  In 2015, Hussein gave birth to her sixth child, bringing her household to eight people in a three-bedroom apartment. (Hussein Dep. at 13:1–25.)  A month after the baby's birth, the landlord told Hussein that her family would need to move out within 60 days because of the Ordinance occupancy restriction.  (*Id.* at 14:2–15:9.)  The Hussein family struggled to find housing after being evicted.  (*Id.* at 20:3–20.)  The family eventually secured new housing in Faribault, but it was difficult and caused a lot of stress.  (*Id.*)

Plaintiff Lucia Porras is Latina, and she has three children.  (Reuvers Decl. ¶ 15, Ex. 13 ("Porras Dep.") at 17:9–11; 18:19–23, Sept. 2, 2020, Docket No. 179.)  On April 21, 2018, pursuant to the Ordinance, the FPD sent a Lease Termination Demand Notice to Porras's landlord because of an investigation by Rice County Social Services, (Porras Dep. at 37:17–22), and the landlord notified Porras and her boyfriend on April 26 that they had

to move out by April 28, (*id.* at 37:17–37:22.)  Porras has since found housing in Waseca, Minnesota, after a long and unsuccessful search for housing in Faribault.  (*Id.* at 63:18–24.)  Porras's children currently reside with her, and she has complied with requirements imposed by Rice County Social Services.  (*Id.* at 95:9–96:8.)

Plaintiff David Trotter-Ford, who is Black, was charged with disorderly conduct outside his family's rental in July 2015.  (Reuvers Decl. ¶ 16, Ex. 14 ("Trotter-Ford Dep.") at 6:2–3, Sept. 2, 2020, Docket No. 181; Decl. of Andy Bohlen ¶ 4, Ex. 3 at 2, Sept. 2, 2020, Docket No. 162-2.)  In August 2015, police issued a second disorderly conduct violation against Trotter-Ford.  (Trotter-Ford Dep. at 27:25–32:18.)  In September 2015, the FPD sent an Eviction Demand Notice to the family's landlord because the August 2015 incident violated the CFMH portion of the Ordinance, and the landlord evicted the family because of these incidents.  (*Id.* at 40:5–42:6.)  The family now lives in Rochester, Minnesota.  (*Id.* at 5:15–24.)

Plaintiff Somali Community Resettlement Services, Inc. ("SCRS") is a nonprofit organization that provides community and resettlement services to the refugee population of southeastern Minnesota.  (Reuvers Decl. ¶ 18, Ex. 16 ("Hared Dep.") at 8:4–14, Ex. 16, Sept. 2, 2020, Docket No. 167-8.)  SCRS has offices in Faribault and Rochester, but most of its work is in Faribault.  (Hared Dep. at 6:22–7:8.)  SCRS asserts that the occupancy restriction has forced it to divert resources, including staff time and emergency funding, to aid Somali residents impacted by the Ordinance, taking away from the other

services SCRS offers. (*Id.* at 129:15–136:12.) SCRS estimates it has helped an average of

five families per week with housing since the adoption of the Ordinance. (*Id.* at 114:10–

25.) SCRS claims 90 percent of housing issues are related to the Ordinance's occupancy

restriction. (*Id.* at 143:3–12.)

## VII.    PROCEDURAL BACKGROUND

Plaintiffs initiated this action against the City of Faribault on June 13, 2018,

(Compl., June 13, 2018, Docket No. 1,), and they filed the operative Amended Complaint

on December 18, 2019, (2nd Am. Compl., Dec. 18, 2019, Docket No. 118.) Based on the

Ordinance, Plaintiffs assert claims for (1) disparate treatment under the FHA;

(2) intentional discrimination in violation of the Equal Protection Clause of the Fourteenth

Amendment; (3) impairment of Plaintiffs' ability to contract in violation of 42 U.S.C.

§ 1981; (4) disparate impact caused by the criminal screening policy in violation of the

FHA; (5) disparate impact caused by the occupancy restriction in violation of the FHA;

(6) intentional racial discrimination in violation of the Minnesota Equal Protection Clause;

and (7) animus against renters in violation of the Minnesota Equal Protection Clause. (*Id.*

¶¶ 410–39.) Plaintiffs allege liability against the City based on the doctrines of

respondent superior, vicarious liability, and municipal liability pursuant to *Monell v. Dep't*

*of Soc. Servs. of New York*, 436 U.S. 658 (1978). (*Id.* ¶ 20.)

The parties engaged in discovery, with fact discovery completed August 3, 2020.

(*See* Order at 1, Mar. 23, 2020, Docket No. 138.) On September 2, 2020, the parties filed

cross-Motions for Summary Judgment on all claims.  (Def.'s Mot. Summ. J., Sept. 2, 2020, Docket No. 157; Pls.' Mot. Summ. J., Sept. 2, 2020, Docket No. 212.)

## DISCUSSION

## I.    STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  At the summary judgment stage, the Court may not make credibility determinations or weigh the evidence before it.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

-22-

## II.    JUSTICIABILITY

### A.    Standing

Before reaching the merits of the cross-Motions, the Court must decide whether the present action is justiciable.  Under Article III of the Constitution, the Court's exercise of judicial power is limited to actual cases and controversies, and standing is the threshold question in determining whether the Court may hear this case.  *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 626–27 (8th Cir. 2011).  To satisfy the constitutional minimum of standing, plaintiffs must show they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Because standing is "not dispensed in gross," a plaintiff must establish standing for each claim and form of relief sought.  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation omitted).

A plaintiff must establish the standing elements "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  At the summary judgment stage, a plaintiff must set forth specific facts by affidavit or other evidence, which will be taken as true to determine standing.  *Id.* (citing Fed. R. Civ. P. 56(e)).  Plaintiffs must "present some evidence to establish a genuine question of fact on the standing issues of injury and causation."  *Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 878 (8th Cir. 2003) (quotation omitted).

-23-

The standing inquiry at summary judgment is not a review of the merits of a plaintiff's claims. *Id.*

### 1. Individual Plaintiffs' Standing – Counts 2, 3, 6, and 7

For the discrimination-based claims under the Fourteenth Amendment Equal Protection Clause, Section 1981,[4] and the Minnesota Equal Protection Clause, each Plaintiff must establish that the passage of the Ordinance caused a particularized injury that is likely to be redressed by their claims against the City. Although Plaintiffs' allegations focus on different aspects of the Ordinance, Plaintiffs claim that the City passed the entire Ordinance with racial animus as at least a motivating factor, and they assert that each Plaintiff has adequately established injury with a sufficiently close connection to the Ordinance, such that this action will redress those injuries. In response, the City counters with several unavailing arguments.

First, the City argues that some Plaintiffs have not shown causation between the City's conduct and their injury because the City merely applied the Ordinance to Plaintiffs' landlords—not to Plaintiffs themselves. However, Plaintiffs offer evidence that their landlords acted as agents of the City, as the Ordinance conscripted their landlords to act

---

[4] Additionally, for the claim under 42 U.S.C. § 1981, Plaintiffs must be part of the statute's protected class—that is, nonwhite—since third-party claims are only permitted in limited circumstances. *See Bilello v. Kum & Go, LLC*, 374 F.3d 656, 659–60 (8th Cir. 2004). Since all Plaintiffs are nonwhite, they are within the group protected by § 1981. The also Court notes that the Somali-American Plaintiffs assert claims both on the basis of race and national origin, since Plaintiffs assert that the City viewed Somali residents as Black. Accordingly, the Court's references to Black residents include residents who identify as Somali.

as third-party police, and all enforcement actions were within the scope of their authority as agents of the City.  As such, taking Plaintiffs' allegations and evidence as true, conduct by private landlords is attributed to the City when assessing standing.

Second, the City takes too narrow a view of the type of injury Plaintiffs must assert. The City argues that some Plaintiffs lack standing because they no longer live in Faribault and do not intend to return[5] and that some were never evicted,[6] so they suffered no injury.  However, all Plaintiffs allege that they suffered injury because of the Ordinance when they had to move, search for new housing, pay more for rent, or experienced psychological injury from stress or worry about their housing situation.  These are particularized and concrete injuries.

Lastly, the City argues that Plaintiffs' claims cannot be redressed because the City has repealed and replaced the 2017 Ordinance, and the occupancy restriction is no longer fully contained within the text of the Ordinance.  However, Plaintiffs need not prove, on the merits, that they are entitled to all forms of requested relief to establish standing. Moreover, the City has not established that the enforcement or underlying motivation of the Ordinance has changed, even today, which are the aspects Plaintiffs contest.  Thus,

---

[5] The City identifies Plaintiffs Jones, Trotter-Ford, and Porras as allegedly lacking standing on this theory.

[6] The City raises this theory as to Plaintiffs Hussein, Ali, and Abdi.  The City raises a similar argument as to Trotter-Ford, maintaining that since he was not named on the lease when his family was evicted, he lacks standing.

the Court finds that all Plaintiffs have presented evidence of particularized injuries-in-fact, proximately caused by the Ordinance, that are likely to be redressable through this action.[7]

> ### 2. Individual Plaintiffs' Standing Under the Fair Housing Act – Counts 1, 4, and 5

For Plaintiffs' FHA claims, the Court must determine whether their interests fall within the "zone of interests" protected by the statute. *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302–03 (2017). Under the FHA, any "aggrieved person" may file a civil action. 42 U.S.C. § 3613(a)(1)(A). An "aggrieved person" is any person who either "claims to have been injured by a discriminatory housing practice" or believes that such an injury "is about to occur." 42 U.S.C. § 3602(i). The Supreme Court has held that "the FHA's definition of person aggrieved reflects a congressional intent to confer standing broadly" and that the original version of the FHA "showed a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Bank of Am. Corp.*, 137 S. Ct. at 1303 (cleaned up) (citing cases).

The FHA disparate treatment claim, Count 1, like the other discrimination claims, challenges the Ordinance in its entirety as motivated by racial and national origin-related animus. Because Plaintiffs have established standing pursuant to the constitutional

---

[7] The City also asserts that some Plaintiffs were injured by the 2014 version of the Ordinance, rather than the 2017 version, which is the version that precipitated the present lawsuit. This argument is addressed more fully below, in terms of potential redressability and mootness issues.

minimum requirements, as explained above, the Court finds that Plaintiffs likewise have standing for their FHA disparate treatment claim.

In Counts 4 and 5, for disparate impact in violation of the FHA, Plaintiffs divide the Ordinance into the criminal screening policy and the occupancy restriction. Although some Plaintiffs' injuries are directly related to only the criminal screening policy or only the occupancy restriction, Plaintiffs are not necessarily precluded from asserting both disparate impact claims collectively. Plaintiffs may have standing to sue pursuant to the FHA even when they are not themselves the target of discriminatory action; rather, a plaintiff need only suffer an injury resulting from the challenged conduct. *Trafficante v. Metro. Life. Ins. Co.*, 409 U.S. 205, 211–12 (1972); *see also City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112, 1131 (9th Cir. 2020) (finding that indirectly injured plaintiffs have standing to sue under the FHA). That is, for FHA disparate impact claims, if a plaintiff is not a member of the impacted protected class, they may still have standing to sue, so long as the claim is brought within an adversarial context and injury is alleged with particularity. *See Trafficante*, 409 U.S. at 211. Indirect claims, or claims by "private attorneys general," are permitted under the FHA because the main enforcement mechanism for the FHA is private lawsuits. *Id.*

Here, the protected classes allegedly impacted by the criminal screening policy are Black and Hispanic renters in Faribault, and the protected class allegedly impacted by the occupancy restriction is Somali renters in Faribault. Although not every Plaintiff is a

member of all allegedly impacted classes, the claims are clearly brought within the adversarial context since the parties dispute the effects and objectives of the Ordinance, and Plaintiffs' injuries caused by the Ordinance are alleged with particularity.  Thus, the Court finds that all Plaintiffs have standing to assert Counts 4 and 5 for disparate impact in violation of the FHA.

### 3.    SCRS Organizational Standing

Finally, SCRS, as an organization, has standing to sue "when there is a concrete and demonstrable injury to an organization's activities which drains its resources and is more than simply a setback to its abstract social interests."  *Nat'l Fed'n of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  Under the FHA, an organization has standing if it "devotes significant resources to identify and counteract a defendant's unlawful practices," *Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd.*, 160 F.3d 433, 434 (8th Cir. 1998) (cleaned up), such as by spending money to combat housing discrimination, *City of Miami*, 137 S. Ct. at 1303 (citing *Havens Realty*, 455 U.S. at 379).

Here, SCRS has sufficiently established a concrete injury.  Taking as true and viewing the record in the light most favorable to Plaintiffs, helping Somali families find rental housing in Faribault has become SCRS's main priority, rather than one among a set of various programs.  Its resources, both time and finances, have been drained in that endeavor, and SCRS has had to forego other priorities in the process.  As such, the Court

finds that SCRS has satisfied the standing requirements for its claims related to the occupancy restriction.

## III.    MOOTNESS

The City further asserts that, because the City passed an updated Ordinance and revised its CFMH training materials in 2019, Plaintiffs cannot show causation between their injuries and the current version or enforcement of the Ordinance.  In other words, the City argues that Plaintiffs' case is moot because the 2017 Ordinance, which Plaintiffs initially challenged, is no longer in effect.

While there were changes made by the City, "[d]efendants who argue mootness due to changed circumstances based on their own behavior face a heavy burden." *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 740 (8th Cir. 2005).  A case might become moot if "subsequent events" show that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted). Otherwise, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *Id.* (quotation omitted).

Despite the repeal and replacement of the 2017 Ordinance, and the relevant changes made in 2019, Plaintiffs' case is not moot.  As an initial matter, Plaintiffs state in the operative Amended Complaint that they are challenging both the 2017 and 2019

iterations of the Ordinance.  Second, the City has not presented any evidence suggesting that the application or enforcement of the Ordinance has changed since 2017 based on changes made in 2019 to the Ordinance or the CFMH training materials.  The City therefore has not met its burden to show that the challenged behavior—i.e. evictions and/or rental application rejections because of police contact of some sort or rental unit occupancy—will not recur.  Third, Plaintiffs are not solely seeking injunctive relief; they also seek damages, meaning that "the current litigation still presents to the [plaintiffs] an opportunity for redress" with respect to either iteration of the Ordinance.  *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1035 (8th Cir. 2004).  As such, an actual, ongoing controversy exists between the parties, and the case is not moot.  *Accord Thrivent Fin. for Lutherans v. Acosta*, No. 16-3289, 2017 WL 5135552, at *6 (D. Minn. Nov. 3, 2017).

In sum, the Court finds that Plaintiffs' claims are justiciable.  Accordingly, the Court will now consider whether genuine issues of material fact exist with respect to Plaintiffs' substantive claims.  The Court will first address the federal intentional discrimination claims, then the FHA disparate impact claims, and lastly the Minnesota constitutional claims.

## IV.    INTENTIONAL DISCRIMINATION UNDER FEDERAL LAW

Plaintiffs claim that the City's Rental Licensing Ordinance, although facially neutral, is discriminatory on the basis of race and national origin because it was motivated by animus and discriminatory intent when initially implemented, and thus the Ordinance

violates the Fair Housing Act, the Fourteenth Amendment Equal Protection Clause, and 42 U.S.C. § 1981.[8]

### A. Counts 1 and 2: Fair Housing Act and Fourteenth Amendment

To establish a violation of the Equal Protection Clause, Plaintiffs must show proof that discriminatory intent was a motivating factor in enacting the Ordinance. *Mensie v. City of Little Rock*, 917 F.3d 685, 689 (8th Cir. 2019). Likewise, for their disparate treatment claim under the FHA, Plaintiffs must show proof of discriminatory purpose through either direct or indirect evidence. *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010). Since both claims require a showing of discriminatory intent, the Court will analyze them together.

When, as here, discriminatory intent is based on indirect evidence, the Court applies the same *McDonnell Douglas* burden-shifting framework as in Title VII disparate treatment cases. *Gallagher*, 619 F.3d at 831. First, a plaintiff must establish a prima facie

--------

[8] The parties dispute whether evidence of discriminatory intent or racial animus leading up to passage of the first rental licensing Ordinance in 2014 exposes the City to liability based on its enactment and enforcement of the 2017 and 2019 versions. The City asserts that even if there were evidence in the record supporting an inference of animus leading to the 2014 Ordinance, such evidence cannot result in liability here. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (finding that a defendant did not need to show that new legislation purged the taint of prior discriminatory action). In *Abbott*, the Supreme Court addressed whether a prior finding of animus in a school districting plan required the school district to show that future districting plans were done without animus, and found that the burden remained on the plaintiff to establish discriminatory intent. *See id.* The Court agrees that the burden remains on the Plaintiffs to establish discriminatory intent, but the Court does not agree with the City that minor revisions to the Ordinance, which did not change the purpose or effect of the law, somehow automatically purged the taint of any animus motivating its initial enactment.

case by identifying evidence supporting an inference of discriminatory intent. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981). Then the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action. *Id.* at 254–55. If the defendant satisfies this burden, the plaintiff must prove that the defendant's proffered rationale is pretext for discrimination. *See United States v. Badgett*, 976 F.2d 1176, 1178 (8th Cir. 1992).

### 1. Prima Facie Case of Discrimination

To establish a prima facie case of discrimination, intent may be inferred from the totality of the relevant facts, *see Washington v. Davis*, 426 U.S. 229, 242 (1976), based on factors such as: the historical background of the decision; the sequence of events leading up to the challenged decision; departures from the normal procedural or substantive decision-making sequence; and the legislative or administrative history, especially contemporary statements by decisionmakers, meeting minutes, or reports. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977)). Additionally, indications that an action bears more heavily on one race than another is strong evidence of discriminatory intent. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 489 (1997).

Here, Plaintiffs first assert that the Ordinance bears more heavily on Black and Hispanic residents than white residents because it makes it harder to find rental housing. Moreover, City officials and City Councilmembers were aware that the Ordinance would disparately affect minority residents because, among other things, they were aware of

the Somali community's concerns about the lack of rental housing for large families. Plaintiffs also argue the evidence suggests that the City did not pass the Ordinance until a swell of complaints about the Somali community arose, and other potential avenues to address those concerns, such as a loitering or nuisance ordinance, were foreclosed. Thus, Plaintiffs contend that racial animus must have been at least a motivating factor in the City's action. Plaintiffs also assert that the views of City councilmembers confirm that animus motivated the Ordinance, such as comments by the former mayor about a "new look" downtown, and a desire to transform downtown into housing for young professionals and relocate Somali families into other neighborhoods.

The City argues that the Eighth Circuit has rejected equal protection claims based on similar evidentiary records, finding that plaintiffs could not show a prima facie inference of intentional discrimination, and urges the Court to do likewise. *See Mensie*, 917 F.3d at 691; *DeWalt v. City of Brooklyn Park*, No. 15-4335, 2017 WL 2178310, at *5– 6 (D. Minn. May 17, 2017), *aff'd* 715 Fed. Appx. 580 (8th Cir. 2018). However, Plaintiffs' case is decidedly different.

In both *Mensie* and *DeWalt*, plaintiffs initiated discrimination suits after their applications for zoning exceptions were denied. In *Mensie*, the Eighth Circuit found that the evidence did not support an inference of racial discrimination because, among other things, the record showed that a race-neutral rationale and an interest in preserving the residential nature of the area motivated the denial. *Mensie*, 917 F.3d at 690. In *DeWalt*,

the District of Minnesota denied summary judgment because the court found that the city followed its normal conditional use permit application process and that, even if community members made comments at required public meetings that could be construed as showing racial animus, the record did not support an inference that city councilmembers made or adopted such statements or views. *DeWalt*, 2017 WL 2178310, at *5–7.

Here, on the other hand, there is evidence in the record of undisputedly race-based complaints and concerns from Faribault residents. Residents' negative views about the Somali population in Faribault were expressed over a sustained period of time and in various settings, not just at one or two city council meetings about zoning. Additionally, the context is distinct; unlike routinely responding to a zoning application, the City demonstrated an affirmative motivation to enact a new ordinance to screen out certain rental applicants.

The Court finds that the confluence of racialized complaints leading up to the Ordinance's enactment, the City's knowledge that the Ordinance would have negative effects on the Somali community, and the City's desire to eliminate low-rent housing downtown, create an inference that the City implemented the Ordinance because of its potential displacement of Black residents, not merely in spite of such effect. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (finding that plaintiffs must provide evidence implying that a decisionmaker selected a "course of action at least in part 'because of,'

not merely 'in spite of,' its adverse effects upon an identifiable group.")  Thus, Plaintiffs have satisfied their burden to establish a prima facie case by identifying evidence that supports a reasonable inference that racial animus was among the motivating factors for the Ordinance.

The City counters that the record cannot support an inference of racial animus because, while Faribault residents may have demonstrated racial animus, their views cannot be imputed to the City Council.  However, the Eighth Circuit has suggested that racial animus expressed by members of the community who seek to influence decisionmakers with respect to the pertinent action can be evidence of discriminatory purpose when local officials effectuate the discriminatory designs of private individuals. *United States v. City of Black Jack*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1974).

Plaintiffs identify statements by multiple City officials suggesting that they were influenced by residents' complaints or were motivated to support the Ordinance by their own racial animus.  For example, former Mayor Jasinski testified that the most frequent complaint he heard was about the Somali community, and SCRS Executive Director Hared testified that former Mayor Jasinski made racist remarks about the Somali community himself.  Other City officials stated that the purpose of the Ordinance was, among other things, to remove "undesirable" residents and "problem" tenants.  *See Smith v. Town of*

*Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (interpreting the term "undesirables" as a racially charged code word).[9]

Although Plaintiffs may not rely on the motives of just one or two City officials or councilmembers, *see S. Wine & Spirits of Am. Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 808 (8th Cir. 2013) (finding that one legislator's motive cannot be attributed to the entire legislature and the highest executive officer),[10] the Court finds that the public and pervasive nature of resident complaints, combined with statements by multiple City officials and councilmembers, support a reasonable inference that racial animus was a widely held motive, or that the Ordinance "effectuate[d] the discriminatory designs of private individuals." *City of Black Jack*, 508 F.2d at 1185 n.3. In sum, based on the record presented, the Court finds that the evidence supports an inference that the City was motivated, at least in party by racial animus when it enacted the Ordinance.

### 2. Legitimate, Nondiscriminatory Objectives, or Pretext for Discrimination

Finding that the record supports a reasonable inference of racial animus, the Court considers the remaining steps of the burden-shifting framework. At the second step, the

---

[9] *Cf. Crossroads*, 2016 WL 3661149, at *2, *5 (noting that, at least for purposes of surviving a motion to dismiss, defendant's goal of addressing "problem" neighborhoods and "undesirable residents" was evidence of intentional discrimination in an FHA disparate treatment case).

[10] *Accord Griggs v. Chickasaw Cty.*, 930 F.3d 696, 704 (5th Cir. 2019) ("[T]he dispositive question is simply whether the retaliatory animus is also chargeable to the Board itself. Where the evidence relates to individual members of a board, other circuits require proof that a majority of the multimember body had the requisite motive to impute the retaliatory animus to the board." (cleaned up).)

City asserts that by enacting the Ordinance, it sought to improve the quality of rental housing and renters' quality of life, and to improve the health, safety, and welfare of City residents. Further, the CFMH is intended to encourage "active management" by landlords and increase code compliance, and the occupancy restriction is intended to prevent or reduce "overcrowding" in rental properties. These are legitimate, nondiscriminatory objectives. *See Gallagher*, 619 F.3d at 837 (identifying "keeping the City clean and housing habitable, and making the City's neighborhoods safe and livable" as legitimate policy objectives).

However, at the final step, the Court finds that a factual dispute remains as to whether the City's rationale is pretext for discriminatory intent. Plaintiffs argue that it is pretextual because the problems the City purportedly wanted to fix did not really exist, but were, in fact, products of the animus itself, including documented, widespread concerns about crime downtown and racially motivated complaints about renters, such as the Jones family. According to Plaintiffs, because the City could not pass a loitering ordinance to address community complaints and fears about the Somali community downtown, the City resorted to the Ordinance instead. Plaintiffs also assert that pretext is proven by the City's dropping crime rate between the years 2000 and 2014, which shows that the CFMH was unnecessary to prevent or reduce crime. The Court finds that these facts support a reasonable inference that the City offered a justification for the Ordinance that was a pretext for discrimination.

-37-

Conversely, the City asserts that the Court should reject Plaintiff's theory because it would limit the City to only addressing housing or crime issues after they arise, yet governments frequently and legitimately enact proactive legislation. Moreover, the City argues that the record documents the City's long-term interest in implementing crime-free housing and rental licensure programs, that these programs were recommended by an outside consultant, and that there were concerns about the lack of upkeep of rental properties—all evidence that the City's purpose was legitimate and nondiscriminatory. The Court finds that these facts also support a reasonable inference that the City acted without pretext of animus.

As such, a reasonable jury could find in favor of either party. Accordingly, the Court will deny the cross-Motions as to Counts 1 and 2, because there remain genuine disputes of material fact—namely, whether the Plaintiffs have shown pretext for discrimination, and thus whether Plaintiffs have satisfied the ultimate burden of proving that racial animus was at least one motivating factor for the Ordinance—which only a factfinder may resolve.

### B.    Count III: 42 U.S.C. § 1981

To sustain a claim under Section 1981, a plaintiff must prove discriminatory intent, which can be accomplished by applying the *McDonnell Douglas* framework in the same fashion as for the FHA disparate treatment and Equal Protection Clause claims. *Dirden v. Dep't of Hous. & Urban Dev.*, 86 F.3d 112, 114 (8th Cir. 1996). However, the analysis

requires a different prima facie showing, that (1) plaintiff is a member of a racial minority, (2) defendant intended to discriminate against the plaintiff on the basis of race, and (3) the discrimination concerned an area enumerated by Section 1981, including a contract. *Williams v. Lindenwood University*, 288 F.3d 349, 355 (8th Cir. 2002). Additionally, unlike Plaintiffs' other intentional discrimination claims, merely showing that discriminatory intent was one motivating factor is insufficient; rather, under Section 1981, the "plaintiff bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

In this case, the first and third components of the prima facie case are clearly satisfied: Plaintiffs are members of racial minorities and the purported discrimination concerned their leases, a type of contract. Additionally, as discussed above, Plaintiffs have presented sufficient evidence to create an inference of intentional discrimination on the basis of race, which partially satisfies the second step of the prima facie case. To clear the remaining step, Plaintiffs must show that the City would not have passed the Ordinance but-for the influence of racial animus.

Plaintiffs argue that the evidence supports an inference of "but-for" causation because, despite similar policies being previously contemplated, the City only enacted the Ordinance after receiving increasing complaints about the Somali population in Faribault, and would not have done so but-for such complaints. The City maintains that it did not

pass the Ordinance previously because of budget and resource constraints, and only decided to do so after Chief Bohlen started working for the City and promoted the policy.

Because of the conflicting evidence, the Court finds that there remains a genuine dispute of material fact as to whether changing demographics and racial animus were the dispositive factors that finally led the City to implement the Ordinance. Accordingly, the Court denies the cross-Motions as to Count 3.

## V.    DISPARATE IMPACT UNDER THE FAIR HOUSING ACT

In addition to their intentional discrimination claims, Plaintiffs also assert that the Ordinance results in unlawful disparate impacts on the basis of race and national origin in violation of the FHA. Pursuant to the FHA, it is unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Disparate impact claims are viable under the FHA based on the "otherwise make unavailable" language, which looks to consequences rather than intent. *Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys.*, 576 U.S. 519, 534 (2015). Viable disparate impact claims can provide a remedy in two situations that disparate treatment may not reach: counteracting unconscious prejudices; and removing artificial, arbitrary, and unnecessary barriers to minority housing. *Inclusive Cmtys.*, 576 U.S. at 540.

Disparate impact claims are analyzed through another burden-shifting regime. *See id.* at 527 (discussing the burden-shifting framework embodied by HUD regulations); *see also* 24 C.F.R. § 100.500(c). At the time the Supreme Court decided *Inclusive Communities*, HUD regulations provided that a plaintiff must first make a prima facie showing "that a challenged practice caused or **predictably will cause** a discriminatory effect," 24 C.F.R. § 100.500(c)(1) (2013) (emphasis added); then the burden shifts to the defendant to prove that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest; then, plaintiff may ultimately prevail by showing that the defendant's goal could be served by a less discriminatory policy, *id.* § 100.500(c)(2)–(3).[11] *Inclusive Cmtys.*, 576 U.S. at 527. Disparate impact claims are subject to "cautionary standards" and "safeguards" at each stage of the applicable burden-shifting framework, to avoid "displac[ing] valid governmental and private priorities" due to fear of disparate impact liability. *Inclusive Cmtys.*, 576 U.S. at 544.

---

[11] Since *Inclusive Communities*, HUD issued revised regulations governing disparate impact FHA claims. The new regulations, effective September 24, 2020, eliminate the explicit mention of claims based on a policy that "predictably" causes a disparate impact. *See* 24 C.F.R. § 100.500(a) (2020). Despite this change, "HUD recognizes that a claim based on a predictable disparate impact may succeed. This Rule's language does not preclude such a claim, it merely does not recognize this specific type of claim." *See Implementation of the Fair Housing Act's Disparate Impact Standard*, 85 Fed. Reg 60288-01 at 60306–07 (Sept. 24, 2020). Therefore, the Court finds that predictable disparate impact claims remain viable under the standards articulated in *Inclusive Communities*.

### A.    Count 4: Criminal Screening Policy

Plaintiffs claim that the City's criminal screening policy, comprised of the CFMH criminal background check requirement and eight-hour training, predictably causes disparate impacts on the basis of race and national origin.  Plaintiffs contend the criminal screening policy disproportionately impacts Black and Hispanic potential tenants since those groups are more likely to have criminal histories, including convictions, arrests, and other contacts with the police and criminal justice system.  Plaintiffs also argue that the Ordinance effectively prohibits renting to potential tenants with criminal histories through its broad prohibitions on disorderly conduct, training materials on using criminal background checks for tenant screening, and threats of criminal penalties on landlords.  At minimum, Plaintiffs argue, the criminal background check requirement creates a barrier to renting that weighs more heavily on Black and Hispanic applicants than white applicants.

The City maintains that the Ordinance does not, and has never, barred renting to individuals with criminal histories and emphasizes that the CFMH training includes instructions about setting criteria for analyzing criminal background checks.  The City further avers that Plaintiffs have failed to establish causation because the Ordinance is enforced by private landlords, Plaintiffs present no comparative data from the qualified applicant pool, and any disparate impact is caused by societal disparities in the criminal justice system—not the Ordinance.

### 1. The City's Vicarious Liability for Landlord Conduct

As an initial matter, whether the City is exposed to liability for enforcement of the Ordinance by private landlords depends on whether landlords act as the City's agents. The FHA imposes vicarious liability in accordance with traditional agency principles. *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Whether an agency relationship exists depends on factual elements: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." *S. Pac. Transp. Co. v. Con't Shippers Ass'n Inc.*, 642 F.2d 236, 238 (8th Cir. 1981).

The City presents evidence that landlords are encouraged to set their own criteria and asserts that landlords retain exclusive authority to make decisions about tenants, but Plaintiffs present evidence that the City intends for private landlords to act as "third-party police" in enforcement of the CFMH. Plaintiffs argue that the City need not direct the entirety of landlords' actions, but that any conduct that can be attributed to the City exposes it to potential liability under the FHA.

The FHA prohibits any conduct that makes dwellings unavailable on the basis of race or national origin. 24 C.F.R. § 100.70(b); *see also Conn. Fair Hous. Ctr. v. CoreLogic Rental Property Solutions, LLC*, No. 18-705, 2020 WL 4570110, *14–15 (D. Conn. Aug. 7, 2020) (discussing agency relationship and proximate cause of disparate impacts under the FHA). Based on the record, the Court finds that a reasonable jury could conclude that the

City's conduct makes housing unavailable because the City trains landlords to reject potential tenants with criminal histories and evict tenants who appear to engage in disorderly conduct, and that landlords do so on the City's behalf. Thus, the Court will consider Plaintiffs' disparate impact claim, as a genuine dispute exists as to whether landlords are agents of the City.

### 2. Prima Facie Showing of Discriminatory Effect

Turning to the effects of the criminal screening policy, and whether Plaintiffs have made a prima facie showing that the criminal screening policy creates a discriminatory effect, the Court first determines whether Plaintiffs have established that the CFMH prohibits renting to tenants with criminal histories. Plaintiffs argue that, although the Ordinance's language does not prohibit renting, its enforcement does by means of threatened criminal penalties, unfettered and unguided use of criminal background checks, and the City's training materials. Yet, the City has provided some evidence to suggest that there are individuals with criminal records, including felony convictions, who are renting in Faribault.

Although not binding, HUD has issued guidance advising that a housing policy that denies housing to anyone with a prior arrest or any kind of criminal conviction will create a race-based disparate impact that cannot be justified, and therefore such a practice

violates the Fair Housing Act.[12]  Thus, whether the criminal screening policy results in a complete prohibition on renting to potential tenants with criminal backgrounds is highly probative for Plaintiffs' disparate impact claim.  However, it is possible that requiring a far-reaching criminal background check could itself be an unlawful barrier, if it makes it more difficult—even if not impossible—for Black and Hispanic residents to obtain housing.[13]  *Accord Gilead Cmty. Servs. Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 72 (D. Conn. 2019) ("Courts have found that a defendant 'otherwise makes [housing] unavailable' under the Fair Housing Act when the defendant engages in a series of actions that imposes burdens on . . . a protected class of residents or intended residents, making it more difficult for the members of the protected class to obtain housing or conveying a sense that the members of the protected class are unwanted.")

Based on the record, the Court finds that there is insufficient evidence to conclude, as a matter of law, that the Ordinance results in a complete prohibition on renting to individuals with criminal histories.  *Cf. Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 173–74 (E.D.N.Y. 2019) (finding a question of fact as to whether defendants applied a "blanket ban" on renters with criminal convictions).  Yet, a

---

[12] U.S. Dep't of Hous. and Urban Dev., *Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real-Estate Transactions*, at 10 (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

[13] The Court notes that the HUD Guidance does not only focus on complete prohibitions on renting based on criminal background, but also any "criminal records-based barrier."  *See* U.S. Dep't of Hous. and Urban Dev., *supra* note 12, at 2.

complete prohibition is not required to establish disparate impact. The Court will therefore turn to the question of whether the criminal screening policy caused or predictably will cause a discriminatory effect.

To support their disparate impact claim, Plaintiffs present expert statistical analysis of racial disparities in the criminal justice system and rental market. Plaintiffs' expert witnesses show that, on average, a disproportionate share of incarcerated individuals in Rice County, where Faribault is located, are Black or Hispanic. In combination with data showing that a higher percentage of Black and Hispanic Faribault residents rent their homes, Plaintiffs experts conclude that there is evidence the CFMH will predictably create a disparate impact on the basis of race and national origin. The City, through their rebuttal expert, argues this analysis shows correlation, rather than causation, and that the data is general population data, rather than actual data on rental outcomes or a comparative qualified applicant pool, and thus is insufficient. According to the City, any housing disparity is caused by racial disparities in the criminal justice system, not the criminal screening policy, and the City urges the Court to reject Plaintiffs' disparate impact claim based on insufficient evidence that the criminal screening policy creates race-based disparities.

At the outset, the Court finds that the Plaintiffs present a straightforward theory of causation: the criminal screening policy is the reason they were unable to remain in their homes and had difficulty finding new homes, and the cause of broader disparities in

access to rental housing for Black and Hispanic residents.  *Cf. Crossroads*, 2016 WL 3661146, at *8 ("Plaintiffs' causation argument is straightforward: Defendants' policies are the reason they are unable to remain at the complex.").  It is of course true that the City did not create the pervasive and well-known racial disparities in the criminal justice system.  But if the City's criminal screening policy intersects with a pre-existing, known racial disparity in a way that creates a similar racial disparity in housing, then it is possible that the City's policy creates a housing disparity and violates the FHA.

Next, the Court finds that, since Plaintiffs present a predictable disparate impact claim, they may be able to ultimately succeed without presenting actual demographic data on rental applications accepted and rejected in Faribault.  Importantly, unlike in the case relied upon by the City to rebut Plaintiffs' argument, the rental requirements here apply to the general population of potential renters; anyone could apply for rental housing in Faribault, so general population data is relevant.  *Cf. Alexander v. Edgewood*, 2019 U.S. Dist. LEXIS 111068 at *13 (finding that evidence of general racial disparities is insufficient unless all residents are qualified for public housing); *see also Davis v. D.C.*, 925 F.3d 1240, 1254 (D.C. Cir. 2019) (rejecting general population statistics when position at issue required a bachelor's degree).  Moreover, although the City argues that Plaintiffs must prove an "actual impact," it does not dispute that actual comparative data is unavailable.  *Cf. CoreLogic*, 2020 WL 4570110, at *19 (noting that, "it is undisputed that actual applicant data is unavailable," before considering uncontroverted national and

state-level statistics on racial disparities on arrests); *see also Badgett*, 976 F.2d at 1178

("The elements of a prima facie case of discrimination will vary from case to case,

depending on the allegations and the circumstances.").  Additionally, the Eighth Circuit

has found that plaintiffs "are not required [to] provide a particular statistical comparison"

to show a prima facie case of disparate impact.  *Gallagher*, 619 F.3d at 837 (8th Cir. 2010)

(quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)).

Finding that Plaintiffs may, in theory, use general population data to support their

predictable disparate impact claim, the Court next considers the "safeguards" required by

*Inclusive Communities*.   576 U.S. at 544.   "A disparate-impact claim that relies on a

statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies

causing that disparity."  *Id.* at 542.  The Supreme Court thus requires a showing of "robust

causality" between the disparity and challenged policy to "ensure[] that 'racial

imbalance . . . does not, without more, establish a prima facie case of disparate impact'

and thus protects defendants from being held liable for racial disparities they did not

create."  *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)).

Establishing robust causality is particularly vital for predictable disparate impact claims.

*See Implementation of Fair Housing Act's Disparate Impact Standard*, 85 Fed. Reg. at

60306–07.

Since *Inclusive Communities*, courts have explored what the "robust causality"

standard requires in practice.  *See Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920

F.3d 890, 903–05 (5th Cir. 2019) (discussing four views on the robust causality requirement from the Eighth, Fourth, and Eleventh Circuits).  In *Ellis v. City of Minneapolis*, the Eighth Circuit held that "[u]nder *Inclusive Communities*, a plaintiff must, at the very least, point to an artificial, arbitrary, and unnecessary policy causing the problematic disparity."  860 F.3d 1106, 1114 (8th Cir. 2017) (quotation omitted).

Here, a reasonable jury could infer that the CFMH was artificial, arbitrary, and unnecessary.  As discussed above, the record supports a reasonable inference that the City was motivated to enact the CFMH by racial animus, and an intentionally discriminatory policy is certainly artificial and arbitrary.  Additionally, the scope of required criminal background checks could result in arbitrary exclusion, since they include minor interactions with local police, charges as well as convictions, and impose no time limits on how far back to consider criminal history.  There is also contradictory evidence as to whether the criminal screening policy has improved crime rates and quality of rental housing—in other words, whether it is necessary.

Because the record supports an inference that the criminal screening policy is artificial, arbitrary, and unnecessary, the Court proceeds to examine whether the statistical evidence demonstrates that the criminal screening policy caused or predictably will cause a discriminatory effect.  Since the Eighth Circuit has not had occasion to apply the robust causality standard to statistical evidence, the Court looks to other persuasive caselaw.

The Fourth Circuit found that plaintiffs can satisfy the robust causality requirement by presenting a "sufficiently substantial" statistical disparity to create an inference of causation. *See Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 425–26 (4th Cir. 2018), *cert. denied sub. nom.*, 139 S. Ct. 2026 (2019). The Fifth Circuit has also suggested that statistical disparities are more likely to satisfy the robust causality requirement when the policy at issue is new and will increase barriers to housing. *See Lincoln Prop. Co.*, 920 F.3d at 906 ("[W]e find it significant that the disproportionate impact upon Latinos that the *Reyes* majority held satisfied robust causation was the consequence of a *change* in the defendant's enforcement of its policy that increased the number of Latinos facing eviction from the park than before.").[14] Like the Fifth Circuit and other district courts,[15] the Court finds the Fourth Circuit analysis relevant and probative here, and will examine the record for evidence of substantial statistical disparities that raise an inference of causation.

Based on the record, the Court finds that there remains a genuine dispute of material fact as to whether Plaintiffs have sufficiently established a statistical disparity supporting an inference of causation. Plaintiffs present expert analysis that finds

---

[14] *See also Crossroads*, 2016 WL 3661146, at *7–8 (discussing likelihood that defendant's new criteria would push out existing apartment residents).

[15] *Accord, e.g.*, *Sw. Fair Hous. Council Incorp. v. Maricopa Domestic Water Improvement Dist.*, 438 F. Supp. 3d 991, 999 (D. Ariz. 2020); *Connecticut Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, No. 18-705, 2020 WL 4570110, at *19 (D. Conn. Aug. 7, 2020); *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 176 (E.D.N.Y. 2019).

statistically significant differences in the ability of Black and Hispanic families to rent in Faribault: over 90% of Black households rent in Faribault, compared to around 30% of white families.  In Minnesota, both Black and Hispanic residents are more than six times as likely to have been incarcerated than white residents.  According to Plaintiffs' expert, by imposing a mandatory criminal background check, statistical disparities in rental housing arise, in that 10.61% of Black families would not be able to rent in Faribault because of the criminal screening policy, whereas only 2.39% of white families would not be able to rent.

In *Reyes*, plaintiffs alleged that a policy requiring all mobile home park occupants over age 18 to present documentation of legal status in the United States violated the FHA because it disproportionately ousted Hispanic or Latino families from their homes. *Reyes*, 903 F.3d at 419.  Plaintiffs in *Reyes* provided statistical evidence that Latinos were ten times more likely than non-Latinos to be adversely affected by the policy because undocumented immigrants constitute 36.4% of the Latino population compared with only 3.6% of the non-Latino population.  *Id.* at 428.  These plaintiffs did not, however, present data on the actual impact of the ordinance at the mobile home park.  The Fourth Circuit considered whether the statistics raised an inference of causation, and found that the plaintiffs satisfied robust causality "by asserting that the specific Policy requiring all adult [] tenants to provide certain documents proving legal status was likely to cause Latino

tenants [] to be disproportionately subject to eviction compared to non-Latino tenants."
*Id.* at 429.[16]

Here, Plaintiffs provide evidence that Black Faribault residents are around 4.4 times more likely than white residents to be excluded because statistics show that 10.61% of Black families would not be able to rent in Faribault compared to 2.39% of white families.  In light of statistics that show over 90% of Black families, but only around 30% of white families rent, a likelihood of exclusion four times higher is substantial. Additionally, evidence suggests that Plaintiffs themselves did not face adverse housing effects until the Ordinance was implemented and then enforced against them.   For example, Plaintiff Jones was only pushed out of her rental house once her landlord was threatened with penalties under the Ordinance.

However, unlike the policy in *Reyes*, the effect of the criminal screening policy is less straightforward.  In *Reyes*, providing documentation of legal status for all occupants over the age of eighteen was a bright-line requirement to renew a lease, *see id.* at 419–20, whereas, here, there is evidence in the record that Faribault's criminal screening policy provides at least some flexibility to landlords.  Additionally, the City's rebuttal expert witness calls the credibility of Plaintiffs' expert testimony into question, which the Court cannot assess.

---

[16] Although *Reyes* was decided at the motion to dismiss stage, a similar analysis has been applied at the summary judgment stage.  *See CoreLogic*, 2020 WL 4570110, at *18–20; *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 174–76 (E.D.N.Y. 2019).

As such, there remains a genuine dispute of material fact as to whether the Plaintiffs have shown a prima facie case of discriminatory effect caused by the criminal screening policy because there is a dispute about the exclusionary effects of the criminal screening policy and there are doubts raised about the veracity of the statistical evidence presented. Accordingly, the Court will deny the cross-Motions as to Count 4 and will not reach the remainder of the disparate impact burden-shifting analysis. *Accord CoreLogic*, 2020 WL 4570110, at *19 ("The Court finds that this is a disputed question of fact because 'although the decisions of Plaintiff's experts to rely on a broader potential applicant pool outside of the actual pool of . . . applicants is reasoned, adequately based in law and sufficient for the Court to find the testimony admissible, the more tangential nature of the analysis may diminish the weight a fact-finder would afford the conclusions.'" (quoting *Fortune Soc'y*, 388 F. Supp. 3d at 176)).

### B.    Count 5: Occupancy Restriction Disparate Impact

Plaintiffs claim that the occupancy restriction also predictably results in a disparate impact on the basis of race and national origin. As with the criminal screening policy disparate impact claim, the Court must determine whether Plaintiffs have made a prima facie showing that the occupancy restriction creates a discriminatory effect. To do so within the confines of the *Inclusive Communities* robust causality safeguard, Plaintiffs must show that (1) the occupancy restriction is artificial, arbitrary, and unnecessary, and

(2) provide evidence of a substantial statistical disparity supporting an inference of causation.

First, like the criminal screening policy, the Court finds that, because the record supports an inference that the City implemented the Ordinance because of race-based and national origin-based animus, the occupancy restriction may be artificial, arbitrary, and unnecessary. The potentially arbitrary nature of the occupancy restriction is further highlighted by evidence that the City failed to consider varying cultural expectations or desires for housing occupancy, and instead imposed a strict limit.

As for a statistical disparity, Plaintiffs present evidence that 60% of Black residents in Faribault are Somali, and that many Somali families have ten to twelve household members. Moreover, of available data on Faribault rentals units, Plaintiffs' expert calculated that 87.5% of units with six or more residents had at least one Somali household member. Based on these data points, Plaintiffs' expert opined that the occupancy restriction likely results in a disparate impact on Somali renters. However, the City presents expert testimony that the occupancy restriction does not cause a disparate impact because it does not require displacement of the average-sized Somali family based on the occupants per room standard, and questions the credibility of the Plaintiffs' expert's analysis.

The Court finds that Plaintiffs present a viable theory as to why the occupancy restriction is the reason Somali families have been, or may be, unable to remain in their

homes and face greater difficulty finding rental housing in Faribault.  Even if the City did

not cause the demographic family size disparity, it is possible that its policy has resulted

in a housing access disparity.  However, because there is conflicting statistical analysis as

to the actual or predictable effect of the occupancy restriction, as well as a dispute about

expert witness credibility, the Court finds that there remains a genuine dispute of material

fact.  Accordingly, the Court will deny the cross-Motions as to Count 5, and need not reach

the remainder of the burden-shifting analysis.

## VI.    MINNESOTA EQUAL PROTECTION

### A.    Count VI: Racial Discrimination

Pursuant to the Equal Protection Clause of the Minnesota Constitution, Art. I, § 2,

a classification that involves a suspect classification or fundamental right is subject to

strict scrutiny and must be "narrowly tailored and reasonably necessary to further a

compelling governmental interest."  *Greene v. Comm'r of Minn. Dep't of Human Servs*.,

755 N.W.2d 713, 725 (Minn. 2008) (quotation omitted).  The Minnesota Equal Protection

Clause and the Fourteenth Amendment Equal Protection Clause are applied using the

same principles.  *Id.* at 725.  As discussed above, the Court finds that, based on the record,

a reasonable jury could find that the Ordinance was enacted based on either racial animus

or legitimate factors.  Therefore, like Plaintiffs' Fourteenth Amendment Equal Protection

claim, the Court will deny the cross-Motions as to Count 6 under the Minnesota Equal

Protection claim.

### B.    Count VII: Animus Against Renters

In addition to their intentional race-based discrimination claim, Plaintiffs also assert a claim pursuant to the Minnesota Equal Protection Clause based on animus against renters, claiming unjustified differentiation between renters and homeowners, or, in the alternative, between renters with and without criminal records and with and without large families.[17]

For these claims, the Court must start with the threshold consideration "whether a [law] treats similarly situated individuals differently." *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 656 (Minn. 2012).  If a plaintiff cannot establish that they are similarly situated to those claimed to be treated differently, then there can be no equal protection violation and the analysis ends.  *See id.*  If individuals are similarly situated, the analysis continues, applying either strict scrutiny, or, as here, the Minnesota rational basis standard.  *Id.*  Laws subject to rational basis review do not violate the Minnesota

---

[17] Plaintiffs present inconsistent theories in their Complaint and Motion for Summary Judgment as to why the Ordinance violates the Minnesota Constitution's Equal Protection rational basis test.  Plaintiffs' Second Amended Complaint alleges that the Ordinance "explicitly treats renters differently from homeowners and those residing in owner-occupied housing" and "[t]here is no evident connection between this classification and any legitimate government purpose, and there is evidence that the Ordinance was adopted with animus toward renters." (2nd Am. Compl. ¶ 438.)  The corresponding allegation in Plaintiffs' Motion for Summary Judgment appears to be "Defendant's Ordinance distinguishes between renters with and without criminal records and renters with and without large families." (Pls.' Mem. Supp. Summ. J. at 67.)  The Court will consider both theories, since "it is the facts well pleaded, not the theory of recovery or legal conclusions, that state a cause of action and put a party on notice." *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999) (internal citations omitted).

Constitution if they are "rational means of achieving a legislative body's legitimate policy goal." *Fletcher Props., Inc. v. City of Minneapolis*, 947 N.W.2d 1, 19 (Minn. 2020).

Plaintiffs claim that the Ordinance cannot survive scrutiny, even under a rational basis standard, because there is no valid justification for treating renters and homeowners differently, as the Ordinance does. However, the Court finds that Plaintiffs have not satisfied the threshold showing that renters and homeowners are similarly situated in relevant respects, since "[t]he difference between classes need not be great, and if any reasonable distinction can be found, a court should sustain the classification." *Hegenes v. State*, 328 N.W.2d 719, 721 (Minn. 1983) (quotation omitted). The overarching difference between renters and homeowners is that renters do not own the premises where they reside, and one implication is that, depending on lease terms, renters cannot always make repairs themselves when needed. These differences illustrate that renters and homeowners are not similarly situated in all relevant aspects, since the stated purpose of the Ordinance, to which the Court defers for rational basis analysis, *see Fletcher Props.*, 947 N.W. 2d at 19, is to promote active management by landlords and improve building code compliance. Thus, the Court's analysis ends at this point, and the Court will grant the City's Motion for Summary Judgment with respect to Plaintiffs' Minnesota Equal Protection claim on the basis of animus against renters.

### C.    Count VII: Classifications Among Renters

Plaintiffs alternatively claim that the Ordinance violates the Minnesota Equal Protection Clause because it distinguishes between renters with and without criminal records, and renters with and without large families—distinctions that are more likely to hurt Black, Latino and Somali residents than white residents.    When a statutory classification "demonstrably and adversely affects one race differently than other races," the Minnesota Constitution requires a showing of "actual (and not just conceivable or theoretical) proof that a statutory classification serves the legislative purpose."  *Id.*

As discussed above, the parties dispute whether and to what extent the Ordinance's distinctions among renters are necessary or effective for the City's goals. Thus, the Court finds that whether the parties are similarly situated in relevant respects, or whether there is a viable distinction is a fact question for the jury.  Additionally, whether the criminal screening policy and occupancy restriction demonstrably and adversely affect one race differently than another—put differently, whether they result in a disparate impact on the basis of race—is also a question for the jury based on conflicting evidence in the record.  Accordingly, the Court will deny the cross-Motions on Count 7, to the extent Plaintiffs claim that the Ordinance violates the Minnesota Equal Protection Clause by distinguishing between different classes of renters.

**CONCLUSION**

The Court recognizes that policies similar to those at issue in this case are used by many municipalities nationwide to prevent crime and disrepair in rental housing and encourage housing code compliance by property managers.  However, the Court finds that there remain genuine disputes of material fact as to whether racial animus among residents and City officials led to the passage of the Ordinance; whether, under the Ordinance, landlords are coerced into applying an outright ban on renting to individuals with criminal records of any kind, thereby creating race-based disparities in housing access; and whether the occupancy restriction forces disproportionate evictions of Somali families.  Thus, the Court finds that the record necessitates denying the parties cross-Motions as to all claims—except the Minnesota Equal Protection claim based on animus toward renters—because there is sufficient evidence in the record such that a reasonable jury could find in favor of either party.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 212] is **DENIED**; and

2. Defendant's Motion for Summary Judgment [Docket No. 157] is **GRANTED in part** as to Plaintiffs' Claim of Animus Against Renters in violation of the Minnesota Equal Protection Clause, and **DENIED in part** as to all other claims.

**IT IS FURTHER ORDERED** that this Order shall be filed under seal and the parties

are to show cause on or before five (5) business days from the date of this Order why the

Court should not unseal the Order and to specify any portion of the Order warranting

redaction.  The Court will determine whether suggested redactions are warranted.


DATED: February 18, 2021
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court