UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| THELMA JONES, PRIYIA LACEY, FAISA ABDI, ALI ALI, RUKIYA HUSSEIN, DAVID TROTTER-FORD, LUCIA PORAS, and SOMALI COMMUNITY RESETTLEMENT SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF FARIBAULT, <br><br> Defendant. | Civil No. 18-1643 (JRT/HB) <br><br><br> **MEMORANDUM OPINION AND ORDER DENYING MOTIONS TO EXCLUDE EXPERT TESTIMONY** |

Alejandro Ortiz and Jennesa Calvo-Friedman, **AMERICAN CIVIL LIBERTIES UNION FOUNDATION,** 125 Broad Street, Eighteenth Floor, New York, NY 10004; O. Joseph Balthazor, Jr., Scott Flaherty, and Brandon Blakely **TAFT STETTINIUS & HOLLISTER LLP,** 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402; Ian Bratlie, **ACLU OF MINNESOTA,** 709 South Front Street, Suite 1B, Mankato, MN 56001; Teresa J. Nelson, **ACLU OF MINNESOTA,** P.O. Box 14720, Minneapolis, MN 55414, for plaintiffs.

Andrew A. Wolf, Jason J. Kuboushek, Paul D. Reuvers, and Stephanie A. Angolkar, **IVERSON REUVERS CONDON,** 9321 Ensign Avenue South, Bloomington, MN 55438, for defendant.

The City of Faribault ("the City") implemented a Rental Licensing Ordinance (the "Ordinance"), including a Crime-Free Multi-Housing ("CFMH") program and rental unit occupancy restrictions, in 2014 and subsequently revised the Ordinance in 2017 and 2019. *See* Faribault, Minn., Code of Ordinances, Ch. 7, Art. V § 7-36–44 (2019). Plaintiffs,

a group of current and former Faribault renters, challenge the Ordinance, including what Plaintiffs refer to as the "criminal screening policy"—the requirement that landlords conduct criminal background checks on all potential tenants and attend an eight-hour CFMH training—and the occupancy restriction. Plaintiffs claim that the Ordinance violates the Fair Housing Act ("FHA") through both disparate treatment and disparate impact on the basis of race and national origin, and that it violates 42 U.S.C. § 1981, the Fourteenth Amendment Equal Protection Clause, and the Minnesota Equal Protection Clause.

Relevant here, Plaintiffs claim that the criminal screening policy predictably creates a disparate impact on potential Black and Hispanic renters in violation of the FHA because Black and Hispanic residents are more likely to have contact with the criminal justice system reflected on a criminal background check as compared to white residents. Plaintiffs also claim that the occupancy restriction will predictably result in a disparate impact on potential Black Somali renters because Somali families are larger than white families.

In support of their FHA disparate impact claims, Plaintiffs disclosed two expert witnesses, Dr. Christopher Wildeman and Dr. Allan Parnell, to provide demographic and statistical analysis of incarceration rates and apply those statistics to the rental housing market, and analyze occupancy levels in rental units where Somali residents live in Faribault. The City likewise disclosed two experts, Dr. Dwight Steward to rebut Plaintiffs'

experts, and Dr. Daniel Kennedy to opine on the purpose and efficacy of crime-free housing programs. The parties have each filed a Motion to Exclude Expert Testimony. (*See* Pls.' Mot. Exclude Expert Testimony, Aug. 18, 2020, Docket No. 143; Def.'s Mot. Exclude Expert Testimony, Sept. 2, 2020, Docket No. 152.)

Because the parties present arguments related to the credibility and weight of the proposed expert testimony rather than the testimony's relevance, and because the Court finds that none of the testimony is fundamentally unsupported and resolves all doubts in favor of admissibility at the *Daubert* stage, the Court will deny both Motions.

## I.   STANDARD OF REVIEW

Under Rule of Evidence 702, expert testimony must satisfy three prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires[.]

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (cleaned up); *see also* Fed. R. Evid. 702. The Court has a "gatekeeping" obligation to ensure that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993). The proponent of the testimony must establish, by a preponderance of the evidence, that the expert is qualified, their

methodology is valid, and "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 757–58 (8th Cir. 2006).

The Supreme Court in *Daubert* outlined a non-exhaustive list of factors for assessing reliability, such as (1) whether the opinion is based on scientific knowledge, is susceptible to testing, and has been tested; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology; and (4) whether the theory has been generally accepted by the scientific community. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999) (summarizing *Daubert* factors). However, in *Kumho Tire*, the Court explained that "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141. The reliability inquiry is designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Marmo*, 457 F.3d at 757 (quoting *Kumho Tire*, 526 U.S. at 152).

The Court resolves doubts regarding the usefulness of an expert's testimony in favor of admissibility. *Marmo*, 457 F.3d at 758. "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 929–30 (8th Cir. 2001)

(quotation omitted). Rather than exclusion, "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (quoting *Daubert*, 509 U.S. at 595).

However, even if expert-witness evidence meets the Rule 702 standard, it may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## II. DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT TESTIMONY

The City moves the Court to exclude proposed expert testimony from both of the Plaintiffs' experts because their testimony is not helpful, reliable, or relevant due to their reliance on general population statistics and erroneous assumptions regarding the City's Ordinance.

### A. Summary of Testimony

Plaintiffs disclosed two expert witnesses, Dr. Daniel Wildeman and Dr. Allan McMillan Parnell, who are both trained demographers with backgrounds in sociology and policy analysis. (Decl. Alejandro Ortiz ("Ortiz Decl.") ¶ 4, Ex. C ("Wildeman Report") at 3–4, Aug. 18, 2020, Docket No. 146-3; Ortiz Decl. ¶ 6, Ex. E ("Parnell Report") at 3–4, Aug. 18, 2020, Docket No. 146-5.) First, Dr. Wildeman examined racial disparities in incarcerated populations at county, state, and national levels to estimate risk of contact

with the criminal justice system by using incarceration rate data as a proxy for criminal history. (Wildeman Report at 2–3.) Dr. Wildeman utilized several datasets from various points in time, and applied various statistical methods based on the type of data. (*See id.* at 4–9.) Dr. Wildeman generated one dataset himself by examining the Rice County jail roster to determine racial makeup of the incarcerated population at different points in time.[1] (*See id.* at 6–7; Ortiz Decl. ¶ 5, Ex. D ("2nd Wildeman Report") at 4–5, Aug. 18, 2020, Docket No. 146-4.) Throughout his report, Dr. Wildeman notes shortcomings in his estimates because of dataset constraints, particularly at the local level. (*See, e.g.*, Wildeman Report at 6–7.) Dr. Wildeman concluded that there is evidence that racial disparities in the cumulative risk of experiencing imprisonment at some point in time, which strongly correlates with felony conviction, are at least as high in Minnesota as nationally and that there are substantial racial and ethnic disparities in Rice County incarceration rates, even using an overly conservative method for estimating. (Wildeman Report at 3.)

Then, applying Dr. Wildeman's estimates of cumulative risk of incarceration, a proxy for criminal conviction and criminal history, Plaintiffs' second expert, Dr. Parnell,

---

[1] In his initial Report, Dr. Wildeman examined the Rice County jail roster to generate a dataset from two dates, and a third date through a pre-existing dataset. (*See* 2nd Wildeman Report at 2.) In his second Report, Dr. Wildeman provided additional data through web scraping and use of the "Wayback Machine" to create a larger sample. (*See id.* at 3–4.) He concluded that the additional data provides further support for the existence of substantial racial/ethnic disparities in incarceration in Rice County, Minnesota. (*Id.* at 4.)

"determine[d] if exclusion of those with any criminal conviction from the opportunity to rent in Faribault has a significant disproportionate effect on the ability to rent for Blacks and Latinos relative to Whites." (Parnell Report at 5, Aug. 18, 2020, Docket No. 146-5.) In the course of his analysis, Dr. Parnell also opines that in Faribault and Rice County, Black residents are much more likely than white residents to rent, more likely to have children under 18, more likely to have more than 1.01 occupants per room, and Black Somali residents are more likely to have very large families. (Parnell Report at 10.)

Using Dr. Wildeman's estimates, Dr. Parnell conducted a Z-test for two proportions, which he refers to as the standard statistical test for the type of question at issue. (*Id.* at 12–15.) Dr. Parnell's analysis demonstrated statistically significant outcomes suggesting that higher proportions of Black and Hispanic families would not be able to rent in Faribault compared to white families, if potential tenants with criminal histories are prohibited from renting or excluded from the Faribault rental market. (*Id.* at 10–15.) Dr. Parnell reached the same conclusion using an analysis of income-based disparities. (*See id.* at 18–24.)

Dr. Parnell submitted a Supplemental Report focused on the occupancy restriction after the Plaintiffs received rental occupancy registers from the City. (Ortiz Decl. ¶ 7, Ex. F ("Supp. Parnell Report") at 2, Aug. 18, 2020, Docket No. 146-6.) Relying on identification information provided by a Somali elder in Faribault, Dr. Parnell analyzed the occupancy registers to conclude that a disproportionate share of the higher-occupancy units were

rented by Somali families. (Supp. Parnell Report at 3–4.) Although Dr. Parnell noted that the occupancy register data was limited, he stated that the occupancy registers supported his prior opinion that Somali residents are more likely to have large families than white residents, and are therefore more likely to be affected by the occupancy restriction. (*Id.* at 5–6.)

In his Supplemental Report, Dr. Parnell also provided a survey of literature on "overcrowding." (*See id.* at 6–9.) Dr. Parnell explained that "overcrowding" is "problematic and ill-defined," highlighted cultural differences related to housing occupancy expectations, and opined that the City ignored the limits of overcrowding studies, resulting in a weak basis for the occupancy restriction. (*Id.*)

In sum, Dr. Parnell opines that the effects of race-based conviction disparities, large Somali families, racial differences in renting, and income differentials are "evidence of the significant racial disparities that result from Faribault's Rental Housing Ordinance." (Parnell Report at 24.)

### B. Analysis

In its Motion to Exclude, the City does not dispute that Dr. Wildeman and Dr. Parnell are qualified as expert witnesses. Rather, the City argues that their proposed testimony should be excluded because of their reliance on general population statistics and erroneous assumptions regarding the City's Ordinance. In particular, the City asserts that general disparities in the criminal justice system are too attenuated to use as a proxy

for disparities in the ability to rent in Faribault and that Dr. Parnell incorrectly assumed that the Ordinance flatly prohibits renting to individual with criminal histories.

Plaintiffs respond that the City's arguments relate to questions about the merits of the proposed testimony, not its admissibility, and the Court agrees. First, Dr. Parnell's assumptions that the Ordinance prohibits renting to individuals with criminal histories is consistent with Plaintiffs' position on the merits of their case, so that factor alone does not render the expert testimony unreliable. Second, expert analysis on the extent of racial disparities in the criminal justice system is helpful for a jury to obtain greater understanding of the context of the Ordinance and is probative of the risk of disparate impact from the Ordinance.

Third, the City contends the experts should be excluded because the "best evidence" of a disparate impact is a comparison between two groups—those affected and those unaffected by the policy—based on "actual data." *See, e.g.*, *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003). However, at this stage, Plaintiffs are not required to provide the "best" expert testimony; rather, proposed expert testimony must be useful and reliable. *See Lauzon*, 270 F.3d at 686. Particularly in this case, in the absence of "actual data" on all rental applicants for comparison to accepted and rejected applications, and because no special qualifications are required to rent in Faribault, the proposed proxy-based testimony is useful and therefore admissible. Permitting proxy-

based testimony does not change the ultimate burden on Plaintiffs to establish a disparate impact actually or predictably caused by the Ordinance.

As the Court has previously instructed, if the City feels that Plaintiffs' experts could have used different statistical methods or that their factual basis for the analysis was insufficient, it may attack those insufficiencies on cross-examination. *See Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1078 (D. Minn. 2015). But the Court finds that the proposed testimony satisfies the requisite preliminary assessment and will deny the City's Motion.

### III.   PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY

Plaintiffs argue that proposed testimony by the City's expert witnesses should be excluded because their opinions are neither reliable nor relevant, and therefore not useful to the trier of fact. Because the City's expert witnesses provide distinct opinions, each witness's proposed testimony will be addressed in turn.

#### A.   Testimony of Dr. Daniel Kennedy

Dr. Daniel Kennedy is a forensic criminologist with expertise in housing-related crime and housing for ex-offenders. (Ortiz Decl. ¶ 3, Ex. B ("Kennedy Report") at 2–3, Aug. 18, 2020, Docket No. 146-2.) Dr. Kennedy's Report includes seven opinion statements, as well as additional detail and explanation related to each:

- Opinion 1: American policing has made many strategic and tactical improvements over the past four decades.

- Opinion 2: The elements of Crime Free housing programs enjoy wide-spread criminological foundation.

- Opinion 3: Crime Free programs have enjoyed excellent reputations across the U.S. and Canada.

- Opinion 4: Within appropriate parameters, criminal background checks are of critical importance to effective tenant screening.

- Opinion 5: Faribault's Crime Free Housing Program has improved living conditions in apartment buildings and has resulted in decreases in crime.

- Opinion 6: Neither the former Crime Free/Rental Licensing Ordinance nor the Revised Ordinance prohibits a landlord from renting to someone with a criminal record.

- Opinion 7: Prohibiting Access to Criminal Histories by Landlords Would Result in Harmful Consequences.

(*See* Kennedy Report at 4–10.)

Plaintiffs do not dispute that Dr. Kennedy is qualified to offer his opinion on crime-free housing programs. Rather, they argue that his opinions are neither reliable nor relevant because they are based on a model Crime-Free Multi-Housing Program that differs from the Faribault CFMH, and therefore the testimony is not based on facts relevant to the case. Plaintiffs further assert that Dr. Kennedy's opinions include legal conclusions, would not help the trier of fact, and should be excluded under Rule 403 because any probative value is outweighed by a risk of misleading the jury or confusing the issues.

The Court disagrees and will deny the Plaintiffs' Motion as to Dr. Kennedy. First, Dr. Kennedy's testimony about the purpose, reputation, use, and impact of crime-free housing programs, including the model program, is relevant and helpful to the trier of

fact. The City has indicated that the CFMH program is based on model crime-free programs, so testimony about the purpose and reputation of the model program is probative as to the City's understanding of the program when it chose to implement it. In other words, Dr. Kennedy's testimony is relevant to the question of whether the City had a legitimate basis for imposing the Ordinance. Plaintiffs also argue that Dr. Kennedy based his analysis on incorrect assumptions about how the City's CFMH aligns with the model programs. Yet the City states throughout its CFMH training that the program is based on the model. Thus, cross-examination is a more appropriate avenue to address differences between the City's program and the model program than exclusion. *See Robinson*, 447 F.3d at 1100.

Second, the Court will not exclude Dr. Kennedy's testimony due to improper legal conclusions. Plaintiffs contend Opinion 6, that the Ordinance does not prohibit a landlord from renting to someone with a criminal record, is an improper conclusion on a legal matter that would intrude on the role of the Court. *See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). However, the Plaintiffs argue that the Ordinance prohibits renting to individuals with criminal histories, based not on the language of the Ordinance, but on the required training and application of the Ordinance. In other words, as a fact issue. It is not a legal conclusion for Dr. Kennedy to read the Ordinance and notice that its wording does not explicitly prohibit renting to someone with a criminal background.

The Court also declines to exclude Dr. Kennedy's proposed testimony under Rule 403 based on a risk of misleading the jury or confusing the issues. Any undue prejudice or risk of confusion that arises at trial will be dealt with accordingly, but at this time the Court expects that the jury will be capable of differentiating between the model crime-free housing program and the City Ordinance at issue in the case.

In sum, Plaintiffs will have an opportunity to attack the basis of Dr. Kennedy's opinion, including discrepancies between his understanding of the CFMH program and its actual operation, and differences between the City's CFMH and the model program, through cross-examination. However, an expert witness's incorrect factual basis does not justify exclusion at the *Daubert* stage, *see Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."), and the Court will deny the Motion.

### B. Testimony of Dr. Dwight Steward

Dr. Dwight Steward is an economist and statistician. (Ortiz Decl. ¶ 8, Ex. G ("Steward Report") ¶ 1, Aug. 18, 2020, Docket No. 146-7.) The City retained Dr. Steward as a rebuttal expert in response to the Plaintiffs' experts. (Steward Report ¶ 1.) Dr. Steward has extensive prior experience as an expert witness providing statistical analysis on racial profiling and racial discrimination in the employment context. (*See id*. ¶¶ 2–3.)

Dr. Steward opined that the Plaintiffs' experts employed flawed datasets and statistical methods. (*Id.* ¶ 6.) In particular, Dr. Steward highlights that Plaintiffs' experts rely on general population data and their analyses lack data on actual rental housing applicants in Faribault. (*See id.* ¶ 9–12.) Additionally, Dr. Steward asserts that Dr. Parnell's statistical analyses on incarceration and conviction rates are based on a "mishmash" of data. (*Id.* ¶ 12.) Dr. Steward also submitted a Supplemental Rebuttal Report, providing additional refutation of Dr. Parnell's second report focused on the impact of the occupancy restriction. (Ortiz Decl. ¶ 9, Ex. H ("Steward Supp. Report"), Aug. 18, 2020, Docket No. 146-8.)

Overall, Dr. Steward opines that the Plaintiffs' experts' methodologies are inconsistent with generally accepted methods for showing disparate impact by "comparing the pool of individuals who were actually impacted by a given policy to the pool of individuals who were actually at risk of being impacted by the given policy at issue." (Steward Report ¶ 13.) Dr. Steward contends that Plaintiffs' experts have not shown statistical evidence of a disparate impact caused by the Ordinance—either because of the CFMH requirements or the occupancy restriction. (*Id.* ¶¶ 42–44.)

Plaintiffs ask the Court to exclude Dr. Steward's testimony because he is purportedly unqualified to rebut a fair housing disparate impact analysis, since he has not previously conducted a disparate impact analysis specifically related to a housing policy or Fair Housing Act case. Plaintiffs argue that Dr. Steward lacks knowledge about

disparate impact analyses under the FHA and knows nothing about overcrowding issues. Therefore, Plaintiffs argue that his testimony would not be reliable or relevant. Additionally, Plaintiffs point out that Steward insists that their experts should have used an "actual applicant approach" to disparate impact without explanation as to why it is the only approach, and in contrast to the required proof for FHA liability, which could be established by showing either an actual or predicable disparate impact. As such, Plaintiffs contend that Steward's opinions are largely legal conclusions that tell the jury what result to reach—that there is no disparate impact—and should be excluded.

Upon consideration of Dr. Steward's report and Plaintiffs' Motion, the Court will deny Plaintiffs' Motion. First, Plaintiffs do not dispute that Dr. Steward is qualified as a statistician and economist. Dr. Steward's rebuttal is focused on a critique of the statistical methods used by the Plaintiffs' experts. Dr. Steward emphasizes that, in his opinion, Dr. Parnell's report uses a statistical analysis that merely shows correlation rather than causation. Dr. Steward also critiques the datasets used by Dr. Wildeman. Dr. Steward's rebuttal based on the statistical methods, form of analysis, and reliability of datasets does not depend on any special knowledge of housing or the Fair Housing Act.

Plaintiffs compare Dr. Steward's proposed testimony to the excluded testimony in *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067 (D. Minn. 2015). In *Khoday*, the Court excluded proposed expert testimony regarding a "conjoint analysis" because the defendants "offered no evidence that [the expert] ha[d] ever been trained in or

performed conjoint analysis[.]" *Id.* at 1079. In other words, the Court found that an expert could not rebut statistical testimony about a research method with which the expert had no prior personal experience.

The Court does not find a similar fatal defect in Dr. Steward's proposed testimony. Unlike the expert in *Khoday*, the City offers evidence that Dr. Steward has previously performed statistical analyses of disparate impact. Rather, it is the substantive subject matter of the statistical analysis with which Dr. Steward lacks experience. Yet parallels between disparate impact under the Fair Housing Act and under employment discrimination laws are well-recognized. *See Tex. Dep't Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519, 539–41 (2015) (discussing similarities and differences between Title VII and the FHA).[2] As such, statistical analysis of disparate impact for this case is not wholly outside Dr. Steward's expertise, as the conjoint analysis was in *Khoday*.

Although Dr. Steward's lack of experience with housing cases may make his testimony weaker, it is does not make it fundamentally unsupported and therefore excludable at the *Daubert* stage. *See Bonner,* 259 F.3d at 929–30. Weaknesses in Dr. Steward's testimony, including any misgivings about his understanding of the Fair Housing

---

[2] *See also, e.g.*, *Sw. Fair Hous. Council Inc. v. Maricopa Domestic Water Improvement Dist.*, 438 F. Supp. 3d 991, 1001 (D. Ariz. 2020) ("Disparate-impact and disparate-treatment claims are generally handled the same from one statutory context to the next." (citing *Hardie v. National Collegiate Athletic Ass'n*, 876 F.3d 312, 319, 319 n.8 (9th Cir. 2017)).

Act or the goals of Plaintiffs' expert testimony, may be exposed through rigorous cross-examination.

Lastly, Plaintiffs express concern that Dr. Steward misunderstands the requirements for proving disparate impact under the FHA. Irrespective of the fact that FHA disparate impact caselaw encompasses both actual and predictable effects, it is valid for the City to contest whether Plaintiffs' experts have shown an actual, documented impact through data or statistical analysis. The lack of evidence of an actual impact may be probative as to questions of causation between the Ordinance and any potential racial disparities among renters in Faribault. Conflicting expert testimony about statistical proof of causation is relevant and helpful to the trier of fact in weighing the evidence.

At trial, articulating the legal standard and burden of proof is the role of the Court, and if Dr. Steward's testimony improperly intrudes, it will be excluded at trial. However, for purposes of the *Daubert* preliminary assessment, his testimony is not so fundamentally unsupported or unhelpful to the trier of fact to warrant exclusion.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion to Exclude Expert Testimony [Docket No. 143] is **DENIED.**

2. Defendant's Motion to Exclude Expert Testimony [Docket No. 152] is **DENIED.**

DATED: February 18, 2021                 _____
at Minneapolis, Minnesota.              JOHN R. TUNHEIM
                                                                       Chief Judge
                                                 United States District Court